**ANVIL BRAND, INCORPORATED,**
Plaintiff,

v.

**CONSOLIDATED FOODS CORPORATION and Gant Incorporated,**
Defendants.

No. 76 CIV 4419 (LBS).

United States District Court,
S. D. New York.

Dec. 8, 1978.

Rubin, Baum, Levin, Constant & Friedman, New York City, for plaintiff; Abraham G. Levin and Brian L. Bilzin, New York City, of counsel.

Watson, Leavenworth, Kelton & Taggart, New York City, for defendants; Leslie D. Taggart, New York City, of counsel.

## OPINION

SAND, District Judge.

This trademark infringement case finds two large corporations complaining primarily of the other's use of the mark RUGGER or RUGGERS (hereinafter collectively "RUGGER") on knit sport shirts. Plaintiff, Anvil Brand, Incorporated ("Anvil"), a Delaware corporation, is doubtless better known by the name it used prior to September 23, 1977, the BVD Company, Inc. Anvil is part of a conglomerate known as the Rapid American Corporation and purports to be the owner of the registered trademark RUGGERS for use on its sport shirts.[1] Consolidated Foods Corporation, a Mary-land corporation, by its wholly-owned subsidiary, Gant Incorporated, a Connecticut corporation (hereinafter collectively "Gant"), have used RUGGER or RUGGERS on various items of clothing, including knit sport shirts, since 1974. Anvil claims that Gant's use of RUGGER constitutes trademark infringement, unfair competition and false designation of origin. In this action, it seeks injunctive and monetary relief.

Gant denies Anvil's claims and has asserted the affirmative defenses of trademark abandonment under 15 U.S.C. § 1127[2] and of laches. Gant asserts a counterclaim requesting cancellation of plaintiff's trademark registration on the grounds of abandonment, 15 U.S.C. § 1119. Gant further counterclaims that it is the owner of the trademark RUGGER which it adopted in 1973[3] after Anvil had allegedly abandoned the mark and claims that only after the tremendous success of Gant's RUGGER products did Anvil resume its use of the mark in violation of Gant's rights. Gant also contends, with a degree of emphasis which has shifted from time to time during the course of this litigation, that the term RUGGER is a generic (at least as applied to rugby players, clothes and equipment normally associated with the game of rugby) but that Gant has acquired proprietary rights in the name as it has been utilized by Gant.[4] Gant is therefore seeking injunctive and monetary relief by reason of Anvil's current use of RUGGER.

1. Trademark registration No. 337,128 was issued by the United States Patent and Trademark office on July 28, 1936 to the B.V.D. Company, Inc. The registration was renewed in 1946, in 1956 and again in July, 1976. The garments to which the mark was to be applied were specified in the registration as sport shirts, in Class 39, Clothing. The RUGGER trademark, prior to 1970, had always been used in conjunction with the BVD trademark. Anvil acquired the RUGGERS and BVD trademark registration through various assignments and corporate acquisitions. The BVD trademark was sold in September, 1976.

2. The statute provides that a mark shall be deemed to be "abandoned", "(a) When its use has been discontinued with intent not to resume. Intent not to resume may be inferred from circumstances. Nonuse for two consecutive years shall be prima facie abandonment;

(b) When any course of conduct of the registrant, including acts of omission as well as commission, causes the mark to lose its significance as an indication of [its] origin." 15 U.S.C. § 1127.

3. In August, 1973, Gant adopted the name RUGGER for use on its already successful rugby-type knit shirts. Actual sales of items bearing the RUGGER mark, however, did not take place until 1974. For purposes of trademark law, use of the mark would be measured from the date of sales.

4. At trial, various items of wearing apparel such as night shirts, tennis clothes and shorts were introduced as representing a sample of the items to which Gant has affixed the RUGGER label.

The issues of abandonment and laches dominated the three day trial of this case. Pursuant to the Court's direction and with the consent of the parties, post trial briefs and affidavits were also filed on the question whether RUGGER is a generic. (Record of the trial ("Rec.") at p. 467, 469, 537). See generally, *Polo Fashions, Inc. v. Extra-Special Products, Inc.*, 451 F.Supp. 555 (S.D. N.Y.1978).

*Use by Anvil*

From 1936 when it registered the mark RUGGERS to 1970, Anvil and is predecessors used the mark in conjunction with BVD on the labels for its regular line of knit sport shirts. This use was under license to Fordham Bardell Shirt Corporation ("Fordham Bardell") from 1954 until 1965 when the company was acquired by Anvil's predecessor. (Rec. 20, 21).

Fordham Bardell's Merchandise Manager from 1955 to 1970 was Joseph Ruggiero. He testified that during that period, approximately 80% of BVD's total annual sales of between 100,000 to 150,000 dozen knit shirts bore the "BVD RUGGERS KNIT" label. (Rec. 55–56). In 1970, Ruggiero left BVD and was replaced by Robert Rush. Rush decided to change the marketing approach of the company. He believed RUGGER had an "elitest" upper class connotation which was unsuitable for use on the more youth oriented "ethnic" shirt which was to be the new focus of the company's knit shirt line. (Rec. 270, 495, 503–04).

Sylvia Jankow, who headed Fordham Bardell's production department from 1954 to 1976, testified that in 1970, when Rush decided to discontinue the RUGGER label on plaintiff's regular line of knit shirts, the company had an inventory of approximately 100,000 RUGGER labels. She, together with Houston Evans, Vice-President in charge of the Livingston, Tennessee factory at which plaintiff's shirts were manufactured during this period, decided to use up this inventory of RUGGER labels on what were described as "promotional" and "close-out" items. (Rec. 60, 61, 64). Promotional goods consisted primarily of the stock left at the end of a season. Additional shirts were made up to fill in missing sizes in the remaining inventory and then the goods were sold to customers at reduced prices. Jankow testified that the BVD RUGGER labels were used on the garments prepared for the express purpose of filling out a size range for close-out items.

Plaintiff submitted invoices which it claimed evidenced sales of such shirts in the years 1971, 1972 and 1973. The invoices themselves did not reflect that the shirts which they covered in fact bore a BVD RUGGER label. Moreover, it appears that many of these sales were to companies which were also a part of the Rapid American conglomerate of which Anvil is a part. While no records of the sales volume were submitted, Jankow testified that the inventory of 100,000 labels had not been exhausted when she left the company in 1976. There was no other credible evidence submitted which evidenced sales of shirts bearing the RUGGER label. Plaintiff presented as witnesses former salesmen who testified that they had sold substantial quantities of plaintiff's knit shirts bearing the RUGGER label during this period of time as part of plaintiff's regular line.[5] This testimony, however, was in sharp contrast to the uncontradicted testimony of Ms. Jankow and Mr. Evans that they received no specific orders to affix the RUGGER label to any shirts and that no new RUGGER labels were ordered or purchased during the years in question.

*Use by Gant*

In February 1971, William R. Keegan joined Gant as President and Chief Execu-

---

5. Much of the trial was devoted to sharply conflicting evidence with respect to the sale by plaintiff of knit shirts bearing the RUGGER mark during the period 1970 to 1973. Anvil relied almost exclusively on oral testimony on this question because it claimed that all of the books and records concerning sales and the nature and extent of the use of the RUGGER mark prior to May, 1973 were destroyed in a fire at a warehouse in Kings Mountain, North Carolina, where such records were presumably maintained.

tive Officer. He undertook a program to shift the marketing emphasis of Gant from dress shirts into the sportswear market. (Rec. 143). In the latter part of 1971 and to a larger extent in 1972, a line of knit shirts was marketed bearing no mark other than "Gant Knit Shirts". (Rec. 144). In August, 1973, at a sales meeting attended by between 50 and 60 people it was decided that an additional name beyond "Gant" should be given to the shirts. (Rec. 146, 147). As Keegan expressed it, "Well, we had been having an outstanding success with the Rugby type shirt and we felt that we should add a name to it to make it more important in terms of presentation and also identification." (Rec. 147). A contest was held at the meeting whereby proposed names were submitted on slips of paper. The persons at the meeting were told that Gant "wanted something which would indicate that [the shirt] was rugged or outdoorish or active or having a feeling of Rugby." (Rec. 148).

"Q  Were these shirts that you were talking about Rugby shirts?

A  Primarily. Rugby type.

Q  Rugby type of shirts. What do you mean by a Rugby type of shirt?

A  A knit shirt with a commonly known as a box collar which is worn for active wear and primarily stripes.

Q  Are you familiar in any sense with the game of Rugby?

A  Somewhat, yes.

Q  What do people wear when they are playing the game of Rugby?

A  Rugby shirts.

Q  I suppose pants?

A  And shorts and socks and shoes.

Q  Were your shirts somewhat like the shirts that the Rugby players used?

A  Yes. They were later adopted by some of the U. S. Rugby teams." (Rec. 148). The name selected for the shirt was RUGGER.

Keegan testified that it was not company practice to search "transitory" names (defined as a "subordinate name"). RUGGER, therefore, was used by Gant without conducting any trademark search. (Rec. 191, 192).

The RUGGER label was developed and in the Spring of 1974 Gant began extensive efforts to launch its RUGGER shirts. Gant's advertising expenditures during 1974 to June 1978 for RUGGER products totalled $1,500,000.

In 1975, Gant expanded its use of RUGGER from use on labels and for advertising purposes to making it an external applique on its knit shirts. (Rec. 180, 182). Recognizing that RUGGER had achieved a high degree of market success [6] which it wanted to protect, Gant, for the first time, consulted with its regular trademark counsel, William R. Liberman, in connection with the possible registration of the mark.[7] Liberman conducted a search of RUGGER in 1975 and advised Gant of the registration by BVD. (Rec. 196, 197).

Gant made no inquiry of plaintiff concerning the extent of its use of the mark nor did Gant take any action with respect to plaintiff's trademark registration. Relying on the fact that no one at Gant "had recognized or known that BVD had used the mark" (Rec. 198), Gant continued its use.

In the spring of 1976, Gant received a cease and desist letter from Anvil's trademark counsel (Exhibit 4) whereupon Gant's trademark counsel had an investigation per-

---

6.  The sales of RUGGER shirts and other garments by Gant were as follows:

| January 1 through December 31 | Total Sales |
| --- | --- |
| 1974 | $ 2,189,640 |
| 1975 | 2,703,581 |
| 1976 | 12,353,839 |
| 1977 | 13,196,401 |
| January–June 1978 | 7,138,000 |
| | $37,581,461 |

7.  In a post-trial affidavit, Mr. Liberman stated: "Sometime in the early 1970's an officer of Gant asked me by telephone if it could use Rugger as a term for sport shirts similar to rugby shirts. I responded that 'rugger' and 'rugby' had the same meaning and that rugger was likely generic or descriptive of such shirts." However, there was no testimony at the trial with respect to an inquiry of Liberman "in the early 1970's".

formed by a private investigator to determine whether RUGGER was being used by plaintiff. The investigator, Seymour Adler, was told on the telephone by three of Anvil's employees (who apparently believed they were talking to a prospective customer) that RUGGERS was a new item not in stock but it would be out for the spring season. (Rec. 228, 229–281, 242–243).

Gant refused to acquiesce in plaintiff's demand that it cease and desist, initially responding that RUGGER was a generic and thereafter maintaining that the mark had been abandoned by plaintiff. Moreover, Gant asserted that Anvil was guilty of laches in failing to act more promptly despite Gant's widespread, extensively advertised use of RUGGERS during the period 1973–1976. This lawsuit was thereafter commenced by Anvil.

### RUGGER as a Generic

Gant's position with respect to the generic issue has undergone several shifts in emphasis during the course of this controversy. It appears that the initial response of Gant's trademark counsel, William Liberman, was that RUGGER was a generic.[8] (Exhibit 4). In its pleadings and initial memoranda, Gant's primary emphasis was on the issue of abandonment and laches. See Pre-Trial Order, pages 2–3.

At a pre-trial conference on October 4, 1978, this Court raised the question of the possible application of *Polo Fashions, Inc. v. Extra Special Products, Inc.*, 451 F.Supp. (S.D.N.Y.1978) to the facts of this case. *Polo* dealt with the question whether "POLO" was a generic term with respect to a type of shirt. At the outset of the trial, Gant took the position, in response to a question by the Court whether the generic issue was being pressed, that:

"First, your Honor referred to the *Polo* case the other day, and, secondly, for a plaintiff to win he must show he has rights, and one of the nonexistence of rights is the fact that the mark is generic for the particular goods which they used it for. That always remains in the case because of course if their mark, whether registered or not, is generic for the products on which they use it, it isn't a valid trademark.

I realize that that works both ways, but I think that's one of the essential facts in the case." (Rec. 8).

As the trial proceeded, the question of generic status assumed greater proportion. Plaintiff initially took the position that by virtue of the terms of the pre-trial order, the question of the generic status of RUG-GER was excluded from the case. (Rec. 544). The Court, however, determined that there was no basis for plaintiff to claim such surprise as to preclude presentation by Gant of evidence relating to the generic question although plaintiffs "had reason to believe that the issue of generic would not be pushed for obvious interest on the part of Gant." (Rec. 456).[9] After discussion among counsel, it was agreed that there would be no oral testimony with respect to the generic issue but that the Court would accept post-trial affidavits and briefs. (Rec. 456–470).

██ It is well settled that a generic term cannot be the subject of a trademark registration for the reason that a manufacturer cannot be deprived of the right to call a product by its name. See 15 U.S.C. § 1052(e); *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir.

---

**8.** "A generic term is one that refers, or has come to be understood as referring, to the genus of which the particular product is a species." *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976).

**9.** It is, of course, obvious why Gant would be ambivalent with respect to whether RUGGER is a generic even though such a finding would defeat plaintiff's claim; such a ruling would open up use of the term RUGGER to the entire

industry. At times Gant urged a position which would have led to a holding that RUG-GERS was a generic with respect to knit shirts but that its use of RUGGER "for various items of wearing apparel other than rugger or rugby shirts has caused 'RUGGER' to be identified in the public mind with Gant" (Defendants' Annotated Proposed Findings, ¶ 33), thus defeating plaintiff's claim and at the same time securing rights in the mark for itself.

1976) and cases cited therein. "No matter how much money and effort the user of a generic term has poured into promoting the sale of its merchandise and what success it has achieved in securing public identification" 537 F.2d at 9, the term cannot be registered even upon proof that the term has acquired a secondary meaning. *Id.* However, application of a generic term in a suggestive, arbitrary or fanciful manner may permit registration of the term for it no longer interferes with describing a product by its correct name.

In support of its contention that RUGGER is a generic, Gant submitted the affidavit of Edmund W. Lee. He was the founder and is currently a director and the Secretary of the United States of America Rugby Football Union, Inc., the governing body for the game of rugby throughout the United States. Mr. Lee has had experience with the game of rugby in the United States since 1932. According to the Lee Affidavit, " 'rugger' has been and is applied not only to the game but to the players and to the equipment used in the game, as for example balls, shirts or jerseys, shorts or trousers, stockings and shoes, as well as the field and goal posts. The words 'rugby' and 'rugger' are completely interchangeable." (Lee Affidavit, ¶ 11.)

Additionally, the Lee Affidavit was accompanied by numerous newspaper articles dating back to 1936 wherein "rugger" and "rugby" were used interchangeably.

It appears clear from the post-trial affidavits submitted by Gant that the game of rugby has become popular in the United States and consequently, the public has become familiar with the distinctive clothing worn by the players. Anvil submitted no information to the Court controverting that RUGGER was generic for the clothing commonly associated with the game of rugby.

■ In terms of American fashion, the clothing commonly associated with the game of rugby such as the bold-striped knit shirts which are the subject of this litigation, are appropriately called RUGGER. Therefore, as applied to such items, the term RUGGER is generic. Neither party can have exclusive rights in its use for this purpose. *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4 (2d Cir. 1976); *Polo Fashions, Inc. v. Extra Special Products, Inc.*, 451 F.Supp. 555 (S.D.N.Y.1978).

*Abandonment*

Since Gant has used RUGGER on items of apparel not associated with the game of rugby, the question still remains whether some of Gant's uses infringed upon Anvil's trademark. The answer to this question rests on whether or not Anvil abandoned the mark prior to Gant's use in 1974.[10]

■ The law grants trademark rights to a party so as to protect the good will associated with the business identified with the mark. If the business itself ceases, the need for the protection of the good will ceases. See, *e. g., American Photographic Pub. Co. v. Ziff-Davis Pub. Co.*, 135 F.2d 569 (7th Cir. 1943); *Industrial Rayon Corp. v. Dutchess Underwear Corp.*, 92 F.2d 33 (2d Cir. 1937); *T&T Manufacturing Co. v. A. T. Cross Co.*, 449 F.Supp. 813 (D.R.I.1978); *R. C. W. Supervisor, Inc. v. Cuban Tobacco Company, Inc.*, 220 F.Supp. 453 (S.D.N.Y. 1963).

■ A necessary prerequisite to trademark protection is a bona fide use of the mark on goods sold in interstate commerce. A token use of a mark may be sufficient to permit registration of a mark but the mark must thereafter be used in order to maintain any rights which may have been acquired by the registration. *Xtra, Inc. v. Warren Petroleum Corp.*, 175 U.S.P.Q. 660 (1972). The question, however, of what

---

**10.** This Court questions whether Anvil can maintain ownership of the registered trademark RUGGER in any event in the face of the recent sale of the BVD trademark. The evidence showed that prior to the sale of the BVD trademark, Anvil and its predecessors always used RUGGER in conjunction with BVD. One wonders the extent to which the good will, if any, associated with Anvil's RUGGER label was in effect sold with the BVD trademark. No evidence on this question was presented at trial. Since other issues are dispositive of this case, the Court does no more than note the existence of the question.

constitutes actual use is not clearly defined. It has been held that a minimal use of a mark which use is not part of "an ongoing program to exploit the mark" is insufficient to vest a party with trademark rights. *La Societe Anonyme des Parfumes Le Galion v. Jean Patou, Inc.*, 495 F.2d 1265 (2d Cir. 1974). Courts have been increasingly reluctant to recognize rights in a mark where only token use of the mark has been made for the sole purpose of reserving the trademark for future exploitation. See generally, Fletcher, *"Time Out", "Snob", "Wipe Out"* and *"Chicken of the Sea": The Death Knell of Token Use"*? 65 Trademark Rep. 336 (1975). Fletcher has suggested that more sympathetic consideration should be given to the token use of a mark formerly widely known (*i.e.*, "Ipana") than one which has not yet served to identify widely the product with its source. *Id.* at 349–50.

This is not to say that circumstances may not justify a proponent's limited use of a mark and still permit the registrant to maintain its trademark rights. See *Carter-Wallace, Inc. v. Proctor & Gamble Co.*, 434 F.2d 794 (9th Cir. 1970) (no abandonment when nominal sales were made for legitimate business reasons). Nor are trademark rights necessarily lost when the once primary trademark becomes subordinate to another, *Guiding Eyes for Blind, Inc. v. Guide Dog Foundation for Blind, Inc.*, 384 F.2d 1016, 55 CCPA 701 (1967), or when, in the absence of intent to abandon, the formerly nationally sold product is sold under the trademark to a limited market by at least one warehouse, *Friedman v. Sealy, Inc.*, 274 F.2d 255 (10th Cir. 1959).

To cancel a trademark registration, there must be a finding of non-use *plus* an intent not to continue its use. *Saxlehner v. Eisner & Mendelson Co.*, 197 U.S. 19, 31, 21 S.Ct. 7, 45 L.Ed. 60 (1900). The continued use of a trademark should be of such quality as to protect the good will for which it was originally adopted. An inference of intent not to resume use of the mark may be drawn from proof of non-use for two years; but this is by no means the sole criterion for determining intent. As stated in the statute, an intent to discontinue use may be inferred from circumstances in a particular case.

With this background, we turn to the question at hand: Did Anvil, which continued to sell knit shirts during 1970 through 1973, applying RUGGER only to promotional goods, discontinue its use of RUGGER with intent to abandon the mark?

It is clear that with the departure of Ruggiero in 1970, RUGGER ceased to be applied to shirts in Anvil's regular line and that the only occasion on which the RUGGER label was used during the period 1970 through 1973 was on promotional goods. The RUGGER label was used simply because shirts traditionally have a label. It cannot be said that the use of the label on the promotional shirts was in any way intended as an inducement of sale. Nor was the application of the label made as a purposeful act of the merchandising management. Plaintiff, through its production management, was merely depleting an inventory of labels it had on hand on items where the use of an obsolete label made no difference.

The relatively minimal sale of items bearing the RUGGER label (from 80,000 to 120,000 dozen shirts per year prior to 1970 to less than 100,000 shirts in five years) together with the testimony of Ruggiero and Rush, are circumstances clearly warranting and, in the face of no credible evidence to the contrary, mandating an inference that Anvil intended to abandon and did abandon the mark after 1970.

The application of the RUGGER label to promotional goods was not a "use" so as to defeat a finding of abandonment. The evidence is clear that the application of the labels was merely to exhaust existing inventory and not a trademark use designed to identify the source of the garment and the good will of the manufacturer. See generally, *Uncas Mfg. Co. v. Clark & Combs*, 309 F.2d 818 (1st Cir. 1962).

*Laches*

In this case as so often occurs in trademark infringement disputes, we find key

executives engaged on a full time basis in the merchandising and marketing of their products testifying that they were totally oblivious to those activities of their competitors which allegedly infringed on their rights. These claims are made despite extensive advertising and other promotional activities of that competitor. We find it difficult to accept, as a matter of fact, plaintiff's contention that it did not learn of defendant's use of the trademark RUGGER until sometime in 1976, in the light of the sales and advertising activities of Gant during the period prior to July 28, 1976. It was only after extensive merchandising efforts had been expended by Gant that Anvil demanded that defendants cease and desist from their allegedly infringing use of RUGGER.

The courts have held that laches, although a bar to an award of damages during the period in which the plaintiff fails to assert its rights, is not a bar to permanent injunctive relief. *James Burrough Ltd. v. Sign of the Beefeater*, 572 F.2d 574, 578 (7th Cir. 1978). In the light, however, of our holding with respect to RUGGER as a generic and Anvil's abandonment of the mark, we need not pursue this point except to note that the failure of Anvil to take action more promptly is in itself supportive of the conclusion that during the period 1970 through March, 1976 when Ruggiero resumed the position of Merchandise Manager, plaintiff had no real interest in use of the mark RUGGER. In short, we believe that plaintiff's present claims and attitudes with respect to the mark are afterthoughts engendered by the high degree of success experienced by Gant.

*Proprietary Rights*

Gant has asserted that it has acquired proprietary rights in RUGGER as applied to items of wearing apparel not associated with the game of rugby. Common law proprietary rights in a generic term are extremely difficult to establish. Length of use and extent of advertising are not determinative. The term must be used in an arbitrary or fanciful manner and must have acquired public acceptance. It was Gant's burden to establish by a preponderance of the evidence that the term as used by it had acquired a secondary meaning. The evidence presented was not sufficient to warrant a finding by this Court that RUGGER had acquired a secondary meaning as applied to items of wearing apparel not associated with the game of rugby. This is not to say, however, that at some subsequent date and on a different record, or in a trademark proceeding, either party would not be able to establish proprietary rights in RUGGER. But, as the record stands, Gant has not established a protectable interest in RUGGER.

This Court has also considered whether any order for the protection of the public is required bearing in mind that Anvil, having sold the trademark BVD is now simply using the word RUGGERS including its use of the term RUGGERS as an applique on the front of the shirt, much in the fashion utilized by Gant. This Court concludes that no such action is necessary since RUGGER is a generic. Labeling a rugger shirt "RUGGER" is equivalent to labelling a polo shirt "POLO", or a dress shirt "DRESS".

The evidence indicates that the Gant product is sold in better specialty and department stores while Anvil's shirts are sold at a lower price to a different trade. Gant, to protect itself against confusion with plaintiff or with respect to others in the industry who may be encouraged by the result in this litigation to utilize the term RUGGER, may conclude that marketing considerations militate in favor of the addition of some additional term identifying the particular RUGGER as being a Gant product.

We think no intervention of this Court in that marketing determination is required but if the parties differ, the Court will entertain any further applications they might care to make consistent with the conclusions set forth herein.

CONCLUSION

A consequence of the foregoing is that neither plaintiff nor defendant is entitled to

claim exclusivity with respect to RUGGER. The claims and cross-claims for injunctive and monetary relief are denied. Gant's counterclaim requesting cancellation of the trademark is granted and the Commissioner of Patents and Trademarks is directed to cancel Registration No. 337,128 pursuant to Section 37 of the Lanham Act, 15 U.S.C. § 1119.

Settle Order on notice.