**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ELECTRO SOURCE, LLC, a
California limited liability
company,
  *Plaintiff-counter-defendant-*
      *Appellant,*

    v.

BRANDESS-KALT-AETNA GROUP,
INC., an Illinois corporation,
    *Defendant-Appellee,*

PELICAN PRODUCTS, INC., a
California corporation,
  *Defendant-counter-claimant-*
      *Appellee.*

No. 04-55844

D.C. No.
CV-02-07974-NM

ELECTRO SOURCE, LLC, a
California limited liability
company,
  *Plaintiff-counter-defendant-*
      *Appellee,*

    v.

BRANDESS-KALT-AETNA GROUP,
INC., an Illinois corporation,
    *Defendant-Appellant,*

PELICAN PRODUCTS, INC., a
California corporation,
  *Defendant-counter-claimant-*
      *Appellant.*

No. 04-55909

D.C. No.
CV-02-07974-NM

9587

ELECTRO SOURCE, LLC, a
California limited liability
company,
          *Plaintiff-counter-defendant-*
                    *Appellee,*

          v.

BRANDESS-KALT-AETNA GROUP,
INC., an Illinois corporation,
          *Defendant-Appellant,*

PELICAN PRODUCTS, INC., a
California corporation,
          *Defendant-counter-claimant-*
                    *Appellant.*

No. 04-56648

D.C. No.
CV-02-07974-NM

OPINION

Appeal from the United States District Court
for the Central District of California
Nora M. Manella, District Judge, Presiding

Argued and Submitted
April 4, 2006—Pasadena, California

Filed August 14, 2006

Before: Sidney R. Thomas, M. Margaret McKeown, and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge McKeown

## COUNSEL

Larry C. Russ, Russ, August & Kabat, Los Angeles, California, for Electro Source, LLC.

Gregory B. Wood, Fulbright & Jaworski, LLP, Los Angeles, California, for Brandess-Kalt-Aetna Group, Inc. and Pelican Products, Inc.

## OPINION

McKEOWN, Circuit Judge:

Is a summary judgment determination of abandonment appropriate when the record supports an inference that the trademark holder—a small, troubled business—continued to transport and sell trademarked goods in the ordinary course of trade as part of a good faith effort to deplete inventory? The answer is no, because the trademark law requires both discontinuance of all bona fide trademark use in the ordinary course of trade and an intent not to resume such use. 15 U.S.C. § 1127. Legitimate commercial transport or sales of trademarked goods, even for a failing business, are sufficient to defeat a claim of abandonment.

Ronald Mallett owned federal Trademark No. 2,073,287 (the "Pelican Mark"), consisting of the word "pelican" below an outline of a flying pelican in a circle, for a backpack/

luggage line. His business had enjoyed some modest success but later was set back by dwindling prospects. Nonetheless, Mallett kept plugging, selling a few backpacks and promoting them at trade shows for several years until he assigned the Pelican Mark to Electro Source, LLC ("Electro Source"). Because he continued to transport and sell his trademarked goods in commerce, he never ceased using the Pelican Mark. The district court concluded, however, that Mallet's use of the mark while depleting his inventory was neither bona fide nor in the ordinary course of trade, and that he therefore abandoned the mark. In reaching its decision, the district court improperly weighed evidence at the summary judgment stage and applied a mistaken legal standard. We reverse the district court's cancellation of the mark and its determination that Mallett abandoned the Pelican Mark before assigning it and remand for further proceedings.

## BACKGROUND

In 1995, Mallett began selling goods under the Pelican Mark. The mark was primarily designed by Mallett's friend Tom Robbins, who lived in Thailand and had access to manufacturing facilities. After working out an unwritten "handshake" agreement, Robbins agreed to manufacture Pelican Mark products overseas, while Mallett agreed to design, market, and sell the goods in the United States.

On November 20, 1995, Mallett filed an application to register the Pelican Mark with the United States Patent and Trademark Office. In 1997, the Pelican Mark issued as Trademark No. 2,073,287, covering wallets, backpacks, totebags, and luggage.

Mallett transported and sold goods branded with the Pelican Mark from 1995 through 2002. At first, sales were promising. According to Mallett, his business was building up a reputation for making quality goods, including "the best back-

pack in the business." Mallett employed sales representatives to sell his products in 1996 and 1997.

In response to this promising trend, Mallett placed a very large order with Robbins in 1996. Unfortunately, sales did not meet expectations, and the 1996 inventory order was not depleted until 2002. Sales dropped sharply in 1997 and 1998. Disappointed with the sales, Robbins parted ways with Mallett in 1998.

Mallett suffered another setback in 1998, undergoing multiple surgeries that spanned the entire calendar year. During this time, Mallett's business took a sharp turn for the worse. His flagging sales required him to fire his sales representatives, and he no longer used invoices or letterhead with the Pelican Mark. Instead, he began making "on the spot" sales for cash, only some of which he documented. Also, because his business failed to show a profit, he ceased to segregate the business income on his tax returns. By late 1998, Mallett was selling backpacks at a steep discount.

In 1999, Mallett took a job selling products as a commissioned salesman for various manufacturers, including No Fear, Billabong, and Koko Island. Although his arrangement with Koko Island was subject to a non-competition agreement, Mallett continued to market his remaining Pelican Mark inventory on the assumption that his products (backpacks and totes) did not compete with the Koko Island goods (shorts, hats and shirts).

From 1999 to 2002, Mallett tried to sell Pelican Mark products out of the trunk of his car to Koko Island customers. Mallett also went to a Florida trade show twice a year (as he had been doing since 1995) to market his products. Documented sales of Pelican Mark goods were made during this time; Mallett also claims that many other undocumented cash transactions were made as well.[1] Although Mallett's enterprise was

---

[1]Mallett declared that he can document sales of Pelican Mark products between 1995 and 2001: 1995, 6027 units; 1996, 5821 units; 1997, 1939

not as successful as he had hoped, his goods always bore the Pelican Mark and, according to Mallett, his business continued to enjoy the reputation of having the "best-made" backpack.

Mallett testified that he continued to sell products out of his car and travel bi-annually to the Florida trade show until he assigned the Pelican Mark, along with all the goodwill of the business, to Electro Source on August 5, 2002. In return for the assignment, Electro Source paid Mallett $15,000 and a grant-back license to use the Pelican Mark on certain goods, subject to maintenance of product quality. At the time of the assignment, Mallett had at least ten boxes of inventory bearing the Pelican Mark. Using his license, Mallett continued to market Pelican Mark goods until finally, in December 2002, he sold his remaining inventory to Electro Source.

Pelican Products, Inc. and Brandess-Kalt-Aetna Group, Inc. (collectively "PPI") manufacture, market, and distribute a variety of products under the trademarks "Pelican Products," "Pelican," and "Peli Products." PPI also registered the mark "www.pelican.com." Electro Source commenced suit against PPI in 2002, setting forth a variety of claims, including trademark infringement of its Pelican Mark. PPI responded with various counterclaims and defenses alleging, among other things, that Mallett had abandoned the Pelican Mark prior to the assignment to Electro Source. PPI moved for summary judgment. The district court agreed with PPI that the Pelican Mark had been abandoned, thus rendering the subsequent assignment to Electro Source ineffective. The court ordered cancellation of the Pelican Mark but denied PPI's application for attorneys' fees. Electro Source appeals the determination

---

units; 1998, 593 units; 1999, 187 units; 2000, 660 units; and 2001, 72 units. These numbers exclude undocumented sales, such as "on the spot" cash sales, sales made at the bi-annual Florida trade show, or other sales to a "number of stores."

of abandonment and the cancellation order, and PPI cross-appeals the denial of attorneys' fees.

## ANALYSIS

This appeal focuses on a single legal question: does the Lanham Act mandate a finding of trademark abandonment where the record on summary judgment supports an inference that the trademark holder persisted in exhausting excess inventory of trademarked goods at reduced prices through good faith marketing and sales, despite the decline of his business?[2] To answer this question, we begin with § 1127 of the Lanham Act, giving its words their plain and ordinary meaning. *See United States v. TRW Rifle 7.62X51mm Caliber, One Model 14 Serial 593006*, 447 F.3d 686, 689 (9th Cir. 2006).

---

[2]PPI, as the party asserting abandonment, is required to "strictly prove" its claim. *Prudential Ins. Co. of Am. v. Gibraltar Fin. Corp. of Cal.*, 694 F.2d 1150, 1156 (9th Cir. 1982) ("Abandonment of a trademark, being in the nature of a forfeiture, must be strictly proved."); *see also Doeblers' Pa. Hybrids, Inc. v. Doebler*, 442 F.3d 812, 822 (3rd Cir. 2006) ("A party arguing for abandonment has a high burden of proof: . . . 'abandonment, being in the nature of a forfeiture, must be strictly proved.' "); *Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc.*, 304 F.3d 1167, 1175 (11th Cir. 2002) ("Because a finding of abandonment works an involuntary forfeiture of rights, federal courts uniformly agree that defendants asserting an abandonment defense face a 'stringent,' 'heavy,' or 'strict burden of proof.' "). The Ninth Circuit has not spoken as to what "strictly proved" means, but at least one district court has required "clear and convincing evidence" of abandonment. *eMachines, Inc. v. Ready Access Memory, Inc.*, 2001 WL 456404, at *5 (C.D. Cal. 2001). We do not need to flesh out the contours of the "strict proof" standard because our resolution of this summary judgment appeal rests on the proper legal construction of § 1127 and the determination that factual issues preclude summary judgment in favor of PPI. *See Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1024 (9th Cir. 2004) (trademark appeal reversing grant of summary judgment and passing on a legal question because there was a genuine issue of material fact and under either interpretation of the legal issue, the case could proceed).

## I.  Section 1127 of the Lanham Act Defines Trademark Abandonment as Requiring Discontinuance of Trademark Use and Intent Not To Resume Such Use

The Lanham Act defines abandonment as (1) discontinuance of trademark use *and* (2) intent not to resume such use:

> A mark shall be deemed to be "abandoned" if . . . the following occurs:
>
> (1) When its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. Nonuse for 3 consecutive years shall be prima facie evidence of abandonment. "Use" of a mark means the *bona fide use* of such mark made in the *ordinary course of trade*, and not made merely to reserve a right in a mark.

15 U.S.C. § 1127 (emphasis added).

Neither "bona fide use" nor "ordinary course of trade" is defined in the statute. Both phrases, however, also appear in the statute's definition of "use in commerce," which provides:

> The term "use in commerce" means *the bona fide use of a mark in the ordinary course of trade*, and not made merely to reserve a right in a mark. For purposes of this chapter, a mark shall be deemed to be in use in commerce—
>
> > (1)  on goods when—
> >
> > > (A)  it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto . . . and
> > >
> > > (B)  the goods are sold or transported in commerce . . . .

*Id.* (emphasis added). Because "trademark" is defined under the statute in part by the "bona fide intention to use [it] in commerce," *id.*, and because both "use in commerce" and "use" for the purposes of abandonment mean "bona fide use . . . in the course of ordinary trade," the meaning of "use" for the purposes of abandonment necessarily signifies "use in commerce" and thus includes the placement of a mark on goods sold or transported. *See Money Store v. Harriscorp Fin., Inc.*, 689 F.2d 666, 676 (7th Cir. 1982) (construing "use" in the definition of "abandonment" in an earlier, but similar, version of the Lanham Act as meaning "use in commerce").

**[1]** Section 1127 thus provides that "use" of a trademark defeats an allegation of abandonment when: the use includes placement on goods sold or transported in commerce; is bona fide;[3] is made in the ordinary course of trade; and is not made merely to reserve a right in a mark. Critically, for present purposes, nothing in the plain meaning of § 1127 excludes from the protections of the statute use of a trademark by a struggling or even a failing business that meets these requirements.

PPI does not challenge the fact that good faith sales of goods bearing the Pelican Mark were made during the critical time period (from 1998, when Mallett's business was clearly suffering, until the Pelican Mark was assigned to Electro Source in 2002). Instead, PPI argues that "those transactions were not made and could not have been 'bona fide' trademark uses because they were not made by or in connection with any business to which goodwill accrued" in light of Mallett's alleged intent to abandon his business after his inventory was depleted.

---

[3]We note that "bona fide" is not defined in § 1127. *Black's Law Dictionary* provides two similar definitions for "bona fide": "1. Made in good faith; without fraud or deceit. 2. Sincere; genuine." *Id.* at 186 (8th ed. 2004). These definitions are unsurprising, as the term "bona fide" in common parlance means " 'made or carried out in good faith; sincere.' " *Nike, Inc. v. McCarthy*, 379 F.3d 576, 582 (9th Cir. 2004) (quoting THE AMERICAN HERITAGE COLLEGE DICTIONARY 158 (3d. ed. 2000)).

The district court implicitly adopted PPI's formulation, which is predicated on prospective abandonment. In its summary judgment order, the district court correctly recited the elements of abandonment, but went on to weigh the evidence and "find, as a matter of law, that Mallett abandoned" the Pelican Mark because Mallett's sales, characterized as attempts to merely "rid oneself of inventory," were not bona fide uses in the ordinary course of trade.

[2] This summary judgment conclusion was erroneous for two reasons. Although it acknowledged that abandonment is generally a factual issue, *see Rivard v. Linville*, 133 F.3d 1446, 1449 (Fed. Cir. 1998), in resolving the issue the court weighed evidence and drew inferences against Mallett as to his intent and as to what constituted sales in the ordinary course of trade. This approach contravenes the rule on summary judgment that all reasonable inferences are to be made in favor of the non-moving party. *See McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).[4] In addition, the district court did not hew to the strict statutory standard for abandonment, which requires complete discontinuance of use, even for a business on its way out. If there is continued use, a prospec-

---

[4]In cases where there is a presumption of abandonment from nonuse, *see* § 1127 ("Nonuse for 3 consecutive years shall be prima facie evidence of abandonment."), a mere statement declaring an intent not to abandon, or an intent to resume, use is not dispositive. *See id.* ("Intent not to resume may be inferred from circumstances."); *Rivard*, 133 F.3d at 1448-49 (affirming summary judgment finding of abandonment where there was a presumption of abandonment from nonuse); *Silverman v. CBS Inc.*, 870 F.2d 40, 46-48 (2nd Cir. 1989) (affirming finding of abandonment after a trial on the merits where there was a presumption of abandonment from nonuse); *Uncas Mfg. Co. v. Clark & Coombs Co.*, 309 F.2d 818, 819-20 (1st Cir. 1962) (same); *Anvil Brand Inc. v. Consol. Foods Corp.*, 464 F. Supp. 474, 481 (S.D.N.Y. 1978) (finding an unrebutted inference of abandonment from nonuse after a trial on the merits). In this case, however, there has not been a trial on the merits, and abandonment cannot be presumed at the summary judgment stage, in light of Mallett's sworn declarations and documentary evidence attesting to his continued use of the Pelican Mark through sales and trade show appearances.

tive intent to abandon the mark or business does not decide the issue of abandonment.

## II. SECTION 1127 REQUIRES INTENT NOT TO RESUME TRADEMARK USE

**[3]** Abandonment under § 1127 requires an intent not to resume trademark use, as opposed to a prospective intent to abandon the mark in the future. This distinction is not merely semantic. An intent not to *resume* use presupposes that the use has already ceased—the first prong of the abandonment statute. In contrast, a prospective intent to abandon says nothing about whether use of the mark has been discontinued. *See Exxon Corp. v. Humble Exploration Co.*, 695 F.2d 96, 102 (5th Cir. 1983) (distinguishing "intent to abandon" from "intent not to resume use"); *KeyCorp v. Key Bank & Trust*, 99 F. Supp. 2d 814, 827 (N.D. Ohio 2000) ("While intent to abandon was the touchstone of legal abandonment in early common law cases, the Lanham Act requires a showing of 'intent not to resume,' rather than 'intent to abandon.' ").

Of course, we recognize that "[n]othing in the statute entitles a registrant who has formerly used a mark to overcome a presumption of abandonment arising from subsequent non-use by simply averring a subjective affirmative 'intent not to abandon.' " *Imperial Tobacco Ltd. v. Philip Morris, Inc.*, 899 F.2d 1575, 1581 (Fed. Cir. 1990). However, a prospective declaration of intent to cease use in the future, made during a period of legitimate trademark use, does not meet the intent not to resume standard. Thus, the district court's collapsing of the standards was at odds with the statute.

**[4]** Consequently, unless the trademark use is actually terminated, the intent not to resume use prong of abandonment does not come into play. *See Money Store*, 689 F.2d at 675-76. In *Money Store*, a trademark holder decided to stop using its trademark, yet continued to make some good faith use of the mark on billboard displays until it sold and assigned the

mark. *Id.* at 669-70. The court held "[t]he statutory definition makes clear . . . that abandonment requires *discontinuance of use* . . . . Although United's use of the mark may have declined by the date of the assignment, any use . . . of the mark was 'in commerce' " and defeats abandonment. *Id.* at 675-76. The question, then, is whether Mallett ceased use of the mark before assignment, not whether Mallett harbored an intent to cease use in the future.

### III.   LEGITIMATE TRADEMARK USE DEFEATS ABANDONMENT

**[5]** The district court erred in failing to recognize that, as a threshold matter, abandonment requires *complete* cessation or discontinuance of trademark use. *See* § 1127; *see also Doeblers' Pa. Hybrids, Inc.*, 442 F.3d at 823 (holding that a trademark was not abandoned because "[t]he simple fact is that the use of [the trademark] never ceased").

**[6]** Our decision in *Carter-Wallace, Inc. v. Proctor & Gamble Co.* offers a bright line rule: "Even a single instance of use is sufficient against a claim of abandonment of a mark if such use is made in good faith." 434 F.2d 794, 804 (9th Cir. 1970). In *Carter-Wallace*, the trademark holder made nominal sales over a period of four years in order to maintain the mark while the trademark rights were litigated in court:

> During the period of the above litigation and thereafter defendant sold deodorant products with the mark SURE, albeit in small quantities. Defendant has not advertised or promoted SURE deodorant other than by listing the product in trade directories. Defendant's sales of SURE deodorant were not made for profit but for the purpose of continuing the business . . . so that the SURE mark would be available for use on a major advertised product when the legal problems . . . were resolved.

*Id.* at 798.

We rejected the argument that the trademark had been abandoned because "only nominal" sales were made "with the sole intent of sustaining the mark." *Id.* at 803. Rather, we held that the mark had not been abandoned because the trademark holder "proferred [sic] legitimate business reasons for its action" in waiting for the trademark ownership issues to be fully litigated and resolved.[5] *Id.* at 803-04 (citing *Mendes v. New England Duplicating Co.*, 94 F. Supp. 558, 560 (D. Mass. 1950), *aff'd*, 190 F.2d 415 (1st Cir. 1951)); *see also Drop Dead Co. v. S.C. Johnson & Son, Inc.*, 326 F.2d 87, 93-94 (9th Cir. 1963) (holding that the transport of a single trademarked product is sufficient to constitute a use in commerce).

**[7]** Good faith nominal or limited commercial sales of trademarked goods are sufficient, we held, to avoid abandonment, where the circumstances legitimately explained the paucity of the sales. *See also Anvil Brand Inc. v. Consol. Foods Corp.*, 464 F. Supp. 474, 481 (S.D.N.Y. 1978) (recognizing that "circumstances may . . . justify a proponent's limited use of a mark and still permit the registrant to maintain its trademark rights," citing *Carter-Wallace*).[6]

---

[5]Consistent with *Carter-Wallace*, we held in *Karl Storz Endoscopy Am., Inc. v. Surgical Technologies, Inc.*, that " 'use in commerce' appears to contemplate a trading upon the goodwill of or association with the trademark holder." 285 F.3d 848, 855 (9th Cir. 2002). This requirement attempts to distinguish activities that may be made in good faith, but nonetheless do not constitute a trademark use. The question is whether the transaction was one that could trade upon the goodwill or association with the trademark. For example, in *Karl Storz*, "a mere repair of a trademarked good, followed by return of the good to the same owner . . . does not constitute a 'use in commerce' " because there was no trademark use—a transaction designed to trade upon the goodwill or association with the trademark. *Id.* In contrast, good faith sales or transport of trademarked goods in commerce typically employ or envision promoting the goodwill associated with the trademark.

[6]In contrast, "[a] trademark maintenance program obviously cannot in itself justify a minimal sales effort, or the requirement of good faith commercial use would be read out of the trademark law altogether." *La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1273

The district court did not follow *Carter-Wallace*'s principle that a single legitimate sale satisfies the use criteria of § 1127. Instead the court assumed that declining sales, discounted sales, depletion of inventory, and the decision not to sue potential infringers were factors that, in combination, were tantamount to discontinuance of bona fide use in the ordinary course of trade. The court made that determination as a matter of law in the face of obvious factual disputes.

This approach suffers from two difficulties: it is at odds with *Carter-Wallace* and reflects a rather cramped view of "bona fide" and "the ordinary course of trade." The district court assumed, and PPI argues, that once Mallett decided to discontinue his business, a fact which he disputes, and liquidate his goods bearing the Pelican Mark, any sales or transport of the trademarked goods were not a "bona fide"

---

n.10 (2nd Cir. 1974). Similarly, the sale of a trademarked item cannot be a trademark use if not made in the ordinary course of trade. *See id.* at 1272-73 (holding, after a trial on the merits, that the "meager trickle of business" of 89 sales in 20 years was not a trademark use because under the circumstances, the sales were designed solely to establish and maintain the trademark right and were inconsistent with commercial exploitation); *Uncas*, 309 F.2d at 819 (upholding the district court's finding of abandonment after a trial on the merits where, following nonuse of a mark before a merger, the clear and undisputed evidence showed that the acquiring company had "no intention of making and selling the [trademarked goods]" or doing business in the business area of the trademark); *Oshman's Sporting Goods, Inc. v. Highland Import Corp.*, 16 U.S.P.Q.2d 1395, 1397 (T.T.A.B. 1990) (finding that a mark was abandoned in the face of nonuse for several years after 1983, where the trademark holder stopped ordering or importing the trademarked item, stopped advertising the item for sale, had no plans to resume use of the mark, and there were no records of shipments or sales after 1983); *Anvil*, 464 F. Supp. at 481 (finding that no trademark use existed where, after a trial on the merits, the evidence clearly showed that left-over trademark labels of a discontinued line were affixed to random promotional shirts, reasoning "[i]t cannot be said that the use of the label on the promotional shirts was in any way intended as an inducement of the sale . . . [n]or was the application of the label made as a purposeful act of the merchandising management").

trademark use. The notion underlying this assumption is that goodwill cannot legitimately attach to a business that may be discontinued at a later date because trademark law requires an existing business to which goodwill could attach. But that is not so. Trademark use does indeed require an existing business, *see Siegel v. Chicken Delight, Inc.*, 448 F.2d 43, 48 n.2 (9th Cir. 1971) ("a trade-mark does not confer upon its owner the right to prohibit a competitor's use of the mark unless the owner himself uses the mark in connection with an existing business"), but it does not follow that a failing, yet ongoing, business automatically abandons its mark although it is still in business.[7] Even a declining business retains, may benefit from, or may continue to build its goodwill until it shuts its doors or ceases use of its marks.

Alternatively, PPI's argument assumes that when the decision is made to liquidate inventory and close out a trade-marked line, any use beyond that point is not "in the ordinary course of trade." We disagree. Although the facts here do not unambiguously show that Mallett decided to abandon his business, even assuming that he did, the Pelican Mark was not abandoned until he actually discontinued use of the trademark with intent not to resume such use. *See* § 1127.

Because the abandonment inquiry is tied to the unique circumstances of each case, it is appropriate to look at the totality of the circumstances to determine if genuine, albeit limited, usage of the mark qualifies a trademark use "in the ordinary course of trade" under § 1127. The factors that guide courts in examining trademark use in the context of trademark registration are instructive:

---

[7]As we know from the seminal Supreme Court trademark case, *United Drug Co. v. Theodore Rectanus Co.*, "[t]here is no such thing as property in a trade-mark except as a right appurtenant to an established business or trade in connection with which the mark is employed." 248 U.S. 90, 97 (1918). This principle does not, however, exclude a business that is not going gangbusters.

> In applying this approach, the district courts should be guided in their consideration . . . by factors . . . such as the genuineness and commercial character of the activity, the determination of whether the mark was sufficiently public to identify or distinguish the marked service [or product] in an appropriate segment of the public mind as those of the holder of the mark, the scope of the [trademark] activity relative to what would be a commercially reasonable attempt to market the service [or product], the degree of ongoing activity of the holder to conduct the business using the mark, the amount of business transacted, and other similar factors which might distinguish whether a service [or product] has actually been "rendered in commerce".

*Chance v. Pac-Tel Teletrac Inc.*, 242 F.3d 1151, 1159 (9th Cir. 2001); *see also Paramount Pictures Corp. v. White*, 31 U.S.P.Q.2d 1768, 1774 n.8 (T.T.A.B. 1994) (the phrases "use in commerce" and "use in the ordinary course of trade" are "flexible enough to encompass various genuine but less traditional trademark uses . . . . [and] reflect[ ] the possibility that use may be interrupted due to special circumstances.' . . . '[T]he Committee recognizes that the ordinary course of trade varies from industry to industry.' . . . Congress' intent that the revised definition still encompass genuine, but less traditional, trademark uses must be made clear.' ") (internal quotation marks omitted) (quoting congressional reports and testimony from the legislative history of § 1127).

Evaluating whether a use is in "the ordinary course of trade" is often an intensely factual undertaking. For a case like this, one involving a waning business, it is useful to consider the term in the bankruptcy context. In that arena, financial distress and failure are ubiquitous and yet sales made under those circumstances may still be "ordinary." In the bankruptcy context,

creditors are not required to prove a particular uniform set of business terms, rather, "ordinary business terms" refers to the *broad range* of terms that encompasses the practices employed by those debtors and creditors, including terms that are ordinary for those under financial distress. Only a transaction that is so unusual or uncommon "as to render it an aberration in the relevant industry," falls outside the broad range of terms encompassed by the meaning of "ordinary business terms."

*In re Jan Weilert RV, Inc.*, 315 F.3d 1192, 1198 (9th Cir. 2003) (citations omitted).

The same general notion merits consideration in the trademark context. Indeed, it is not unusual for a troubled or failing business to sell and assign its trademark, along with the corresponding goodwill and the remaining business. *See Money Store*, 689 F.2d at 669-70; *Carter-Wallace*, 434 F.2d at 798. Some business and financial firms even specialize in rescuing troubled companies, rehabilitating the business, and capitalizing on their goodwill and intellectual property, including trademarks. If trademark protection were stripped the minute a company runs into financial trouble or decides to liquidate, the two cornerstone interests in trademark would be defeated —protection of the public through source identification of goods and protection of the registrant's investment in the trademark. *See United Drug*, 248 U.S. at 97-98; *State of Idaho Potato Comm'n v. G & T Terminal Packaging, Inc.*, 425 F.3d 708, 715 (9th Cir. 2005) ("Trademarks protect the public from confusion by accurately indicating the source of a product."); *New Kids on the Block v. News Am. Pub., Inc.*, 971 F.2d 302, 305 (9th Cir. 1992) (describing the Lanham Act as protecting against the unfair use of a rival's mark, where "the infringer capitalizes on the investment of time, money and resources of his competitor").

[8] Looking at the circumstances of this case, we evaluate the legal requirements for abandonment against the record of

Mallett's sales and his transport of Pelican Mark goods, making all reasonable inferences in favor of Electro Source as the non-moving party. *See Liu*, 849 F.3d at 1208. There are no allegations that Mallett's activities were feigned, non-commercial, insufficiently public, or made merely to reserve the mark. *See* § 1127. Neither are there allegations that Mallett's efforts were unreasonable in relation to his circumstances—a continuing yet failing business trying to sell excess inventory—or to the relevant market. *See Chance*, 242 F.3d at 1159; *Carter-Wallace*, 434 F.2d at 803-04. To the contrary, the record suggests that in the ordinary course of his small, struggling business, Mallett transported and publically displayed his Pelican Mark goods over a number of years in an earnest effort to sell them, and made actual sales. These are core trademark activities that necessarily contemplate trading upon the goodwill of the mark.

**[9]** In sum, the record does not support summary judgment in favor of PPI on the claim of abandonment. We therefore reverse the district court's grant of summary judgment as to abandonment and vacate the order cancelling the Pelican Mark. *See Prudential Ins. Co. of Am.*, 694 F.2d at 1156 (vacating cancellation order because evidence of use defeated abandonment claim).

## IV.   ATTORNEYS' FEES CROSS-APPEAL

**[10]** PPI is no longer a prevailing party. Its cross-appeal on attorneys' fees is moot in light of our disposition of abandonment and cancellation. *Interstellar Starship Servs., Ltd. v. Epix Inc.*, 184 F.3d 1107, 1112 (9th Cir. 1999). We therefore affirm the district court's denial of attorneys' fees.

**REVERSED** as to the grant of summary judgment in favor of PPI on abandonment and cancellation of the trademark, and **REMANDED** for proceedings consistent with this opinion. **AFFIRMED** as to the denial of attorneys' fees. Costs on appeal shall be awarded to Electro Source.