**SPIN MASTER, LTD., et al., Plaintiffs,**

v.

**ZOBMONDO ENTERTAINMENT, LLC, et al., Defendants.**

**Case Nos. CV 06–3459 ABC (PLAx), CV 07–0571 ABC (PLAx).**

United States District Court, C.D. California.

March 7, 2012.

## ORDER RE: DEFENDANTS' MOTIONS FOR SUMMARY ADJUDICATION

AUDREY B. COLLINS, Chief Judge.

Pending before the Court are two motions for summary adjudication filed on January 10, 2012 by Defendants Zobmondo Entertainment, LLC and Randall Horn ("Zobmondo"), one directed at Plaintiffs Spin Master Ltd., et al.'s ("Plaintiffs") theory of lost profits damages, and the other directed at Plaintiffs' theory of disgorgement and punitive damages. (Docket Nos. 464, 465.) Plaintiffs opposed and filed evidentiary objections on January 30, 2012, and Zobmondo replied on February 7,

2012.[1] The Court heard oral argument on these motions on March 5, 2012. For the reasons below, the Court DENIES Zobmondo's Motion directed at Plaintiffs' lost profits theory of damages and GRANTS IN PART Zobmondo's motion directed at Plaintiffs' disgorgement theory.

## FACTUAL BACKGROUND [2]

Following remand from the Ninth Circuit, this case is poised for trial on Plaintiffs' claims of federal and common law trademark infringement of the federally registered trademark "Would You Rather ...?" for games and books involving "humorous, bizarre, or undesirable choices." *Zobmondo Entm't, LLC v. Falls Media, LLC,* 602 F.3d 1108, 1111 (9th Cir.2010). Before Plaintiffs' claims can be tried, though, the Court must resolve Zobmondo's motions challenging the viability of Plaintiffs' claims for damages, which rest on two theories: (1) Plaintiffs' lost profits as measured by Zobmondo's profits; and (2) disgorgement of Zobmondo's unjustly gained profits as a result of the infringement. Plaintiffs also seek punitive damages based on their common law infringement claim, which is also implicated by the pending motions.

On July 31, 1997, Heimberg and Gomberg filed an intent-to-use application with the United States Patent and Trademark Office ("PTO") for the phrase "Would you rather ...?" in Class 16 (books) and Class 28 (board games). (Disgorgement Statement of Undisputed Facts ("SUF") No. 1.) Shortly after in September 1997, they published their first book entitled "Would You Rather ...? Over 200 Absolutely Absurd Dilemmas to Ponder," which sold over 63,000 copies between 1997 and 2002. (*Id.* Nos. 2, 3.)[3] That book was promoted through a "national media campaign" to "hundreds of radio show producers, to television programs (e.g., Jay Leno) as well as other local media," and Heimberg and Gomberg were interviewed by numerous radio stations to promote the book. (2008 Heimberg Decl. ¶ 7.) Also in 1997, they created the website www.wouldyourather.com promoting their book. (*Id.* ¶ 6.) In September 1999, they published a second book entitled "Would You Rather 2, Electric Boogaloo," which sold approximately 15,000 copies between 1999 and 2003. (Disgorgement SUF Nos. 4, 5.)[4] By March 11, 2002, the second book was no longer being printed by the publisher, with no copies sold in 2002 or 2003. (*Id.* Nos. 5–7.) Plaintiffs were still offering both books for sale on their website in

1. Also, on February 7, 2012, Plaintiffs filed a Motion *in Limine* Regarding Defendants' Waiver of Advice of Counsel Through Their Assertion of Their Good Faith Defense, and, in the Alternative, for an Order Compelling Production of Documents and Witnesses Relevant to Defendants' Good Faith Defense, which is related to Zobmondo's disgorgement motion. (Docket No. 508.) Given the Court's resolution of the disgorgement issue herein, the Court need not resolve that motion now. Instead, the Court will consider it as part of the rest of the parties' pending motions *in limine.*

2. The facts of this case have been explained on many occasions by both this Court and the Ninth Circuit, so the Court recites only the

facts necessary to resolve the pending motions. *See Zobmondo Entm't, LLC v. Falls Media, LLC,* 602 F.3d 1108 (9th Cir.2010). Unless noted, the facts are not disputed. To the extent the Court has relied on facts to which the parties objected, those objections are OVERRULED.

3. The yearly sales were as follows: 15,445 units in 1997; 11,466 units in 1998; 15,300 units in 1999; 12,693 units in 2000; 4,044 units in 2001; and 4,179 units in 2002.

4. The yearly sales were as follows: approximately 13,000 units in 1999; 1,257 units in 2000; 723 units in 2001; and no units in 2002 and 2003.

2002, 2003, and 2004, however. (2012 Gomberg Decl. ¶ 6, Exs. 4–6.)

In February 1998, Zobmondo released a board game based on the "Would You Rather" concept; it was prominently marked "Zobmondo!!" and in smaller font, had the tagline "That Crazy "Would You Rather" Game." (Disgorgement SUF No. 10.) In 1999, Zobmondo released a similarly marked board game entitled "Zobmondo!!" with the tagline "That Crazy "Would You Rather" Game—The Prequel." (*Id.* No. 11.) The parties dispute whether Zobmondo's use of the phrase "Would You Rather" on these games was a "trademark" use.

In 2000, the toy company Hasbro licensed the right to distribute Zobmondo's games, which it retitled as "Zobmondo!! the outrageous game of bizarre choices" and sold from 2000 to early 2002 without the use of the phrase "Would You Rather." (*Id.* No. 12.) In early 2002, Zobmondo terminated the license with Hasbro and in November 2002 self-released a repackaged version of its game, prominently titling it "Zobmondo!! Would You Rather . . .? the twisted sick and wrong version" (the "TSW" game), which the parties agree was, in fact, a "trademark" use of the phrase; Zobmondo has sold that game continuously from 2002 to the present. (*Id.* Nos. 13–14.) Zobmondo also released a more family-friendly version of its game in October 2003, entitled "Zobmondo!! Would You Rather . . .? the game of mind boggling questions" (the "Classic game"), which Zobmondo has also sold continuously since that time. (*Id.* No. 15.)

The TSW game was marketed to "Adult Players" because it included violent, gory, and sexual content, and, from introduction through August 2011, it sold 180,000 units and generated approximately $2.9 million in revenue. (Lost Profits SUF Nos. 7, 8, 13.) The more family-friendly Classic game was marketed to ages 12 and up, and, from introduction through August 2011, it sold 915,000 units, generating revenues of approximately $11.9 million, three quarters of which between 2005 and 2011 came by way of mass market retailers like Walmart, Target, Toys 'R Us, and Kmart. (*Id.* Nos. 9, 10, 14, 15.)[5] In addition to the TSW and Classic games, Zobmondo has also sold other versions of its game, including travel versions and a card-game version of the Classic game sold since 2008. (*Id.* Nos. 11, 12).

Zobmondo claims that it did not sell the TSW game in large retail stores because it included adult content, although Plaintiffs suggest that Zobmondo did not sell the TSW game in large retailers because different versions of the game in the same location tend to "cannibalize each other." (Lost Profits SUF No. 18.) In any case, Zobmondo spent significant sums on advertising its games, including on national radio starting in 2006. (*Id.* No. 22.)[6]

In the meantime, the PTO issued a Notice of Allowance to Plaintiffs on January 8, 2002 for Plaintiffs' trademark application, and Heimberg and Gomberg released their first board game using the "Would You Rather . . .?" mark in October 2004.

5. The TSW sold the following units between 2002 and 2010: 2,189 in 2002; 25,506 in 2003; 27,937 in 2004; 24,483 in 2005; 26,-618 in 2006; 24,131 in 2007; 24,350 in 2008; 11,529 in 2009; and 11,397 in 2010. The Classic game sold the following units between 2003 and 2010: 466 in 2003; 11,378 in 2004; 55,011 in 2005; 105,499 in 2006; 122,176 in 2007; 204,856 in 2008; 215,631 in 2009; and 174,562 in 2010.

6. Zobmondo spent the following on marketing: $65,769 in 2003; $78,816 in 2004; $99,184 in 2005; $170,160 in 2006; $255,497 in 2007; $488,996 in 2008; $694,944 in 2009; and $1,067,696 in 2010.

(Disgorgement SUF No. 8.)[7] That game was marketed for ages 16 and up and contained adult content, and Gomberg suggested at one point that the audience consisted of college students and people between 15 and 35 years old who consume products and information online. (Lost Profits SUF Nos. 28–30.) Although Zobmondo suggests that the content was more graphic than its own TSW game, Plaintiffs claim the content of the games was similar; there is no dispute that, unlike the content of Zobmondo's Classic game, the content was not appropriate for a 12 and up age designation. (*Id.*) Heimberg and Gomberg manufactured approximately 2,500 units of their game by its October 2004 release. (*Id.* No. 31.) Thereafter, Heimberg and Gomberg sold fewer than 1,500 units between 2004 and 2007 at a cost as low as $5.00: 138 units in 2004; 438 units in 2005; 408 units in 2006; and 72 units in 2007. (*Id.* Nos. 32, 51.) Their game was never sold in Walmart, Target, Toys 'R Us, or Kmart. (*Id.* No. 49.) Also, between 2003 and 2007, Heimberg and Gomberg spent $61,521 on advertising their products. (*Id.* No. 52.)

In February 2007, Heimberg and Gomberg's company Falls Media entered a license with Imagination Entertainment ("Imagination") to use the "Would You Rather . . . ?" mark on games. Imagination released a DVD version of Plaintiffs' game with toned-down content. (*Id.* Nos. 33, 34.) Plaintiffs offered evidence that one reason Imagination chose a DVD version of the game was that Zobmondo's game was on the market and retailers would be reluctant to carry a second, similar game. (Fleming Decl. ¶ 3.) Imagina-

tion also sold a card game: 1,764 units in 2008 for revenues of $5,205 and 5,749 units in 2009 for revenues of $3,825. (Lost Profits SUF No. 47.) During this period, Heimberg and Gomberg were permitted to sell-off existing inventory, which, when added to their prior sales, resulted in total sales of around 2,000 units of their game earning $20,000 in revenue between October 2004 and February 2011. (*Id.* Nos. 36, 37, 46.)

In September 2009, Imagination finally released a board game version of Plaintiffs' game, which was targeted to audiences 16 years old and up. (*Id.* No. 38, 39, 42.) Imagination's version of Plaintiffs' game sold 260 units in 2009, 341 units in 2010, and 98 units in January and February 2011. (*Id.* No. 41.) Imagination's cost was $1.91 per unit. (*Id.* No. 43.) As with Plaintiffs' first game, Imagination's game was not sold at Walmart, Target, Toys 'R Us, or Kmart. (*Id.* No. 50.) In August 2010, Plaintiff Spin Master purchased the "Would You Rather . . . ?" trademark and product line from Imagination and released a 12–and–up board game in August 2011. (*Id.* No. 45.) Spin Master did not sell a card game. (*Id.* No. 48.)

When Heimberg and Gomberg created their first game, they had planned to sell it in major specialty retailers like Barnes & Noble, Urban Outfitters, and Spencers' Gifts, but each one declined to sell it because Zobmondo's game was being sold there (Lost Profits Statement of Genuine Issues ("SGI") Nos. 160–163),[8] even though Plaintiffs had been successfully selling their "Would You Rather . . . ?" books

---

7. The PTO issued Registration No. 2,970,830 on July 19, 2005.

8. Zobmondo objects that the statements by these retailers are inadmissible hearsay. The objections are OVERRULED because these statements are not "assertions" offered to

prove the truth of the matters asserted, that is, that either Zobmondo's game was in the stores or Plaintiffs' game was not. Fed. R.Evid. 801(a), (c). Those facts are undisputed.

through these retailers (*id.* No. 110). As a result, although Gomberg wanted to create "variations" of their game, he believed it did not make "business sense" to manufacture another version of its game without retail sales avenues, the implication being that Plaintiffs would have expanded their product line if Zobmondo was not already selling through these retailers. (*Id.* No. 164, 194.) In fact, starting in 1997, Plaintiffs created a variety of versions of their books targeted at different audiences, with over one million copies in print, suggesting that a similar expansion in games was possible. (*Id.* No. 200, App'x B.)

As of 2011, Plaintiffs had been able to get their game into Walmart only on an "end cap" at the end of an aisle for a limited time, not in the traditional board game aisle because Zobmondo's game was already there. Target continued to decline to carry Plaintiffs' game until the lawsuit was resolved because it was carrying Zobmondo's game. (*Id.* Nos. 173, 174, 182, 185.) Plaintiffs also had to make profit margin concessions to gain the placement they did. (*Id.* No. 175.) Even Zobmondo's own sales representative testified that Imagination may have had trouble gaining shelf space because Zobmondo had a head start on shelf space at retailers and Plaintiffs' game may be viewed as a "knock off." (*Id.* Nos. 176, 177.)

While Zobmondo claims that Plaintiffs could not get their game into mass retailers due to its adult content, retailers like Walmart and Target commonly ask vendors to change products to suit the retailer's needs, including to "age grade down." (*Id.* Nos. 179, 180, 186, 195.) Walmart even asked Zobmondo at one point to provide a "family edition." (*Id.* No. 178.) Because Zobmondo's game was already on shelves, Plaintiffs never got an opportunity to change its game to appeal to mass market retailers. (*Id.* Nos. 182, 185.)[9]

Even though Plaintiffs did not expand their line of games as Zobmondo did, they have offered testimony from expert Dr. Alan G. Goedde that they could and would have, but for Zobmondo beating them to the market using their trademark. Dr. Goedde called his approach to Plaintiffs' lost profits the "yardstick" proxy approach, which "estimates damages based upon a comparison of the plaintiff's experience to a firm or market in the same industry that is similar to the plaintiff but was unaffected by the illegal activity." (Korn Decl., Ex. 1 (Goedde Report) ¶ 45.) He used Zobmondo's sales starting in 2002 because at that time Zobmondo began using the "Would You Rather . . . ?" mark on its games in the same way Plaintiffs would have used it on similar games. (*Id.* ¶¶ 48–49.) Because no other products bore the "Would You Rather . . . ?" mark, he viewed the market as comprised of two suppliers and opined that, "[i]f Plaintiffs were allowed to be the only supplier of 'Would You Rather . . . ?' branded products, which is what the trademark registration affords, then it [sic] would have earned the benefit of the demand that Zobmondo filled through its infringing

---

**9.** A retail buyer for Target testified that Target was presented with an adult-oriented game called "Dirty Minds" and Target rejected it because the content was too "risky." (Craven Decl., Ex. 32 (Nicks Dep. Tr.) at 25–26.) Target also did not ask that the content be changed. (*Id.* at 78.) And Target had never carried a game with similar content. (*Id.* at 35–36.) However, the buyer from Target also testified that he never reviewed the content of Imagination's adult-oriented game because Zobmondo's Classic game was already being sold there and that he might have considered a game with similar content. (Id. at 34, 47–48.) While this shows that the content of Plaintiffs' game might have posed some barrier to entry into mass retailers, it does not demonstrate that Plaintiffs could never have gotten into mass market retailers. This is a dispute for the jury.

sales." (*Id.* ¶ 49.) He further explained that there is usually at least a two-year incubation period when an independent creator brings a new board game to the market, during which the owner may build sales and test market response to a game, which is similar to the initial three-year period it took Zobmondo to reach mass retailers after ending the license with Hasbro. (*Id.* ¶ 51.) Dr. Goedde believed that, if given the opportunity to bring their game to the market without Zobmondo's interference, "Plaintiffs would have developed and sold a variety of 'Would You Rather ...?' games, based on the variety of 'Would You Rather ...?' books and content developed and sold by Plaintiffs to address various interests, tastes and age groups," so Zobmondo's expansion of its game line was a reasonable measure of Plaintiffs' likely expansion. (*Id.* ¶ 52.)

Dr. Goedde also explained that Plaintiffs' limited game sales did not limit lost profits because Zobmondo gained a first-mover advantage: "[t]he reason for Plaintiffs' limited game sales, as explained earlier, is that Zobmondo captured the benefits of ownership of the 'Would You Rather ...?' trademark by entering the game market in 2002," so it "became the first mover with the first products, the first chance to develop distributor relationships, and the first chance to develop customer relationships, without the restrictions normally placed on a licensee of a trademark." (Korn Decl., Ex. 2 (Goedde Rebuttal Report) ¶¶ 61–62.) In fact, "[e]mpirical research has proven that one advantage to the first mover is a broader product line and brand proliferation," which is particularly true in the board game market because the first mover can establish retail shelf space and retailers will not risk switching to a second entrant. (*Id.* ¶¶ 63–64.) Likewise, retailers are more likely to allow an established owner to expand a line of games, rather than taking any risk on a new entrant. (*Id.* ¶ 65.)

Thus, in Dr. Goedde's view, the "yardstick" approach is appropriate, which "assumes that, but for the defendant's actions, the plaintiff would have performed as well as the yardstick index." (*Id.* ¶ 77.) The theory originated in antitrust cases to measure damages by " 'linking the plaintiff's experience in a hypothetical free market to the experience of a comparable firm in an actual free market.' " (*Id.* ¶ 79.) Because Plaintiffs and Zobmondo are similar entities with similar games sold in a two-supplier market, Zobmondo's profits are a reasonable measure of the profits Plaintiffs would have made absent infringement. (*Id.* ¶¶ 81–88.)

In his view, Plaintiffs do not need to prove a precise unit-for-unit comparison of sales because the proxy measure is only a "rough" estimate of damages. (*Id.* ¶ 89.) That is the reason he did not opine on whether any sales were actually diverted or whether any of Zobmondo's sales were the result of consumer confusion; similarly, he did not analyze the claimed differing content of the parties' games or the different target markets. (Korn Supp. Decl., Ex. 1 (Goedde Dep. Tr.) at 47, 49–53, 101–03, 108, 122–23, 195, 203–04.) Instead, based on his "yardstick" theory, Zobmondo's total sales and total profits were an "excellent proxy" for Plaintiffs because they provided a model unencumbered by the infringement, which was "not dependent on a certain number of board games or certain number of card games or a certain percentage of those games. It's the whole business." (*Id.* at 74–75, 85, 313–14.) Nor was he concerned with the specific obstacles Zobmondo faced in getting its game to the market because, with Zobmondo's history as a model, Plaintiffs would have experienced the same obstacles

in getting their game to the market. (*Id.* at 190–91.)

## LEGAL STANDARD

Summary judgment shall be granted where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A "genuine issue" of material fact exists only when the nonmoving party makes a sufficient showing on the essential elements of its claims on which it bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). An issue of fact is genuine if it reasonably can be resolved in favor of either party. *Anderson*, 477 U.S. at 250–51, 106 S.Ct. 2505. The nonmovant's evidence is to be believed, and all justifiable inferences are to be drawn in the nonmovant's favor. *Id.* at 255. But "mere disagreement or the bald assertion that a genuine issue of material fact exists" does not preclude summary judgment. *Harper v. Wallingford*, 877 F.2d 728, 731 (9th Cir.1989). "Summary judgment in generally disfavored in the trademark arena." *Zobmondo*, 602 F.3d at 1113.

## DISCUSSION

■ Under the Lanham Act, a plaintiff "shall be entitled, ... subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a). Under § 1117(a), a plaintiff may recover an infringing defendant's profits in two situations: (1) as a measure of the plaintiff's own damages; or (2) on a theory of disgorgement of the defendant's unjustly obtained profits. *See Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1407 (9th Cir.1993). The Act "apparently confers a wide scope of discretion upon the district judge in the fashioning of a remedy for a violation of the Act," *Maier Brewing Co. v. Fleischmann Distilling Corp.*, 390 F.2d 117, 121 (9th Cir.1968), with the goal of "mak[ing] acts of trademark infringement, or at the very least acts of deliberate trade-mark piracy, unprofitable," *id.* at 122–23. "In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed." § 1117(a). And any award "shall constitute compensation and not a penalty." *Id.*

### A. *Proxy Theory of Lost Profits*

■ "Damages are typically measured by any direct injury which a plaintiff can prove, as well as any lost profits which the plaintiff would have earned but for the infringement," and "are guided by tort law principles." *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1407 (9th Cir.1993). Any award of lost profits must be supported by "reasonable certainty," which does not require "absolute exactness," but does require a "reasonable basis for computation," to ensure that an award is not "remote and speculative." *Id.* at 1407–08. "To establish damages under the lost profits method, a plaintiff must make a 'prima facie showing of reasonably forecast profits.'" *Id.* at 1407. When the defendant's profits are the measure of the plaintiff's losses, "[t]he plaintiff has only the burden of establishing the defendant's gross profits from the infringing activity with reasonable certainty," which are presumed to be the result of the infringing activity. *Id.* at 1408.

The burden then shifts to the defendant to show "which, if any, of its total sales are not attributable to the infringing activity, and, additionally, any permissible deductions for overhead." *Id.; see also Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.,* 316 U.S. 203, 206, 62 S.Ct. 1022, 86 L.Ed. 1381 (1942) (stating that the infringer bears the burden to show that the "infringement had no relation to profits made by the defendant" because the trademark owner is "not entitled to profits demonstrably not attributable to the unlawful use of [the] mark."). In the end, any "uncertainty in the amount of damages should be borne by the wrongdoer." *Adray v. Adry–Mart, Inc.,* 76 F.3d 984, 989 (9th Cir.1995).

■ Zobmondo advances a two-front attack on Plaintiffs' "proxy" theory of lost profits: (1) the proxy approach cannot apply in this case because it is only appropriate in cases where the infringer has actually diverted sales from the plaintiff; and (2) even if it could apply, this theory does not adequately measure damages because Plaintiffs' claim that it would have reached Zobmondo's success is only speculative. Plaintiffs respond that Zobmondo is taking too narrow a view of the "proxy" theory and that damages can be estimated "by comparing the plaintiff's experience in an industry to a similar company in the same industry that was unaffected by infringement" (that is, Dr. Goedde's "yardstick" approach). (Opp. 2.) As a result, there is enough evidence to support a jury's conclusion that Plaintiffs would have reached Zobmondo's level of success, but for the infringement.

■ The more common proxy theory of profits is based on the idea that the defendant diverted sales that would have gone to the plaintiff but for the infringement. This theory is designed to "compensat[e] the plaintiff for sales which he has lost as a result of his customers being diverted to the infringer," so direct competition is required between the plaintiff and the infringer; "if there is no competition, there can be no diversion of customers." *Maier Brewing,* 390 F.2d at 121; *see also Quia Corp. v. Mattel, Inc.,* Case No. C 10–1902 JF (HRL), 2011 WL 2749576, at *7 (N.D.Cal. July 14, 2011).

Even if there is direct competition between the plaintiff and infringer, some courts have suggested that the "diversion-of-sales" proxy approach is inappropriate when the defendant's success far outstrips the plaintiff's, such as when the infringement claim is based on reverse confusion. *See Visible Sys. Corp. v. Unisys Corp.,* 551 F.3d 65, 80 (1st Cir.2008) ("[P]laintiff's theory of harm was one of reverse confusion, and reverse confusion does not lend itself to any automatic assumption that there is an equivalence between defendant's profits and plaintiff's diverted sales."); *Quia,* 2011 WL 2749576, at *7 ("[A]n award of the defendant's profits is inappropriate in cases of reverse confusion, where the junior user's profits are likely to exceed the senior user's diverted sales."); *cf. Harper House, Inc. v. Thomas Nelson, Inc.,* 889 F.2d 197, 209 n. 8 (9th Cir.1989) (noting in false advertising case that "surrogate measures of damages" are permitted in cases of "palming off" as "crude measures of damage to plaintiff's good will").

Here, if the Court were limited to using the "diversion-of-sales" proxy approach to measure damages, there is little reason to assume that, for every unit of the more than 900,000 games Zobmondo sold, Plaintiffs would have sold each of those units, but for Zobmondo's infringement. Plaintiffs sold only 2,000 units of its own game during that same period, which targeted a somewhat different market than Zobmondo's better-selling Classic game. While Zobmondo's TSW version and Plaintiffs'

game targeted a similar 16–year–old and over audience, Zobmondo's Classic game targeted a much wider 12–and–over audience and, perhaps as a result, comprised the majority of Zobmondo's sales. Plaintiffs presumably could have sold its adult-oriented game to some consumers who did not care about the age level of the content, but they obviously would not have sold to consumers who were looking to purchase a more family-friendly game that Plaintiffs did not offer. *See, e.g., Blau v. YMI Jeanswear, Inc.*, Case No. CV 02–9551 FMC (SHSx), 2004 WL 5313967, at *5 (C.D.Cal. Jan. 2, 2004) (rejecting lost profits because the parties did not share a "target market": plaintiff targeted the "missy" clothing market, encompassing women between the ages of 25 and 45 and defendant targeted girls jeans in the "junior" market and the parties' products therefore did not substantially overlap); *see also Hansen Beverage Co. v. Vital Pharm., Inc.*, Case No. 08–CV–1545–IEG (POR), 2010 WL 3069690, at *7 (S.D.Cal. Aug. 3, 2010) (rejecting lost profits in part because one of defendant's products targeted women and plaintiff's products did not). Of course, under the Lanham Act, Zobmondo bears the burden to show that a portion of its sales would not have gone to Plaintiffs for this reason. *See Tamko Roofing Prods., Inc. v. Ideal Roofing Co.*, 282 F.3d 23, 37 (1st Cir.2002) (placing on the defendant the burden of showing a deduction from lost profits award based on "partial direct competition," which is similar to an element of costs or deductions under Lanham Act).

Moreover, 75% of sales of Zobmondo's Classic game came through mass market retailers like Walmart, Target, Toys 'R Us, and Kmart, while Plaintiff was never able to secure permanent placement with mass market retailers.[10] Absent this type of wide market placement, Plaintiffs are left to speculate that their single adult-oriented game with minimal sales would have gained the sales Zobmondo made through these distribution channels. *See Blau*, 2004 WL 5313967, at *5 (explaining that lost profits were not appropriate because plaintiff sold through specialty stores and boutiques while defendant sold to department stores and through a wholesale store). In fact, for certain periods Plaintiffs had no competing game on the market, suggesting that not only would they have to speculate that they would have secured the sales Zobmondo made, but also that they may not have even been a direct competitor, as contemplated in *Maier Brewing*, 390 F.2d at 121 ("[I]f there is no competition, there can be no diversion of customers."). Zobmondo also spent hundreds of thousands of dollars more on advertising than Plaintiffs spent, suggesting that Zobmondo's success came from factors other than infringement and, for that reason, Plaintiffs may not have been able to secure every sale that Zobmondo made. *See Blau*, 2004 WL 5313967, at *5 (finding lost profits inappropriate because "[t]here is not clear evidence that the parties advertise in the same manner and to the same customer base.").[11]

**10.** While the parties dispute why Plaintiffs could not place their game with these retailers, they do not dispute that Plaintiffs could not, which is the relevant fact here. The reason they could not is important to Plaintiffs' "yardstick" proxy theory of lost profits, as discussed *infra*.

**11.** Zobmondo also cites the difference between the parties' profit margins to suggest that Zobmondo's profits were not a reasonable measure of the profits Plaintiffs lost, even assuming Plaintiffs lost the sales that Zobmondo gained. But Zobmondo does not point to any evidence that the profit Plaintiffs made per unit varied significantly from the profit Zobmondo made per unit.

Plaintiffs, however, counter that these differences in the parties' sales do not undermine their claim for lost profits because Zobmondo's infringement prevented them from even attempting to reach the same kind of success as Zobmondo. Plaintiffs' argument is similar to what one court called the "headstart" theory of damages, which can support an award of lost profits. *See Taco Cabana Int'l v. Two Pesos, Inc.*, 932 F.2d 1113, 1126 (5th Cir.1991), *aff'd on other grounds*, 505 U.S. 763, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). In *Taco Cabana*, a competitor adopted the plaintiff's trade dress for restaurants and expanded rapidly in Houston and outside Texas, but did not enter the San Antonio market, where the plaintiff's restaurants were located. *Id.* at 1117. Even though the plaintiff did not operate in the same markets as the infringer, the jury awarded the plaintiff over $900,000 in lost profits and lost income, which was measured by a franchise fee, continuing royalty fees, and the profit on five restaurants that were foreclosed in the Houston area. *Id.* at 1125–26.

The Fifth Circuit affirmed, rejecting the argument that "only diverted sales provide a proper measure of damages" and adopting the "headstart" theory. *Id.* at 1126. The court explained why that theory entitled the plaintiff to full damages for the restaurants in other areas:

> Especially given the volatility of the restaurant industry, and the significant value of securing the image of "market leader," we believe the "headstart" theory provides an apt framework for [the plaintiff's] monetary recovery. [The infringer's] infringement foreclosed the Houston market, which [was characterized as] "one of the most affluent Mexican food markets in the country." Based on the Houston market alone, [a witness] estimated lost profits of $4.4 million. Other damage models produced

even higher figures. The jury award easily qualifies as reasonable compensation to [the plaintiff].

*Id.* at 1126–27.

Zobmondo argues that *Taco Cabana* is distinguishable because the plaintiff in that case already had some restaurant success in San Antonio and presented records of fees, royalties, and profits, so the jury could have rationally inferred that the plaintiff would have been successful in the Houston market and could have reasonably identified its lost profits in that area. Here, in contrast, Plaintiffs do not have a similar history and record of profits from which to measure Plaintiffs' actual losses.

■ Yet, some level of uncertainty is expected in applying Plaintiffs' theory because Zobmondo's infringement prevented Plaintiffs from establishing a more precise measure of losses. *See Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264–65, 66 S.Ct. 574, 90 L.Ed. 652 (1946). While a jury may not award damages based on "speculation and guesswork," the jury "may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly," including by relying on "probable and inferential" proof. *Id.* at 264, 66 S.Ct. 574. If the jury could not rely on some uncertainty, the infringer could "profit by his wrongdoing at the expense of his victim." *Id.* That concern is particularly acute in this case, where the plaintiff alleges that the infringer's wrongdoing was so complete that almost all of the trademark holder's success was prevented. Thus, to allow the uncertainty created by the infringer's conduct to defeat damages would "be an inducement to make wrongdoing so effective and complete in every case as to preclude any recovery, by rendering the measure of damages uncertain"; in other words, "the more grievous the wrong done, the less

likelihood there would be of a recovery." *Id.* at 264–65, 66 S.Ct. 574. Therefore, "the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." *Id.* at 265, 66 S.Ct. 574.

To account for the uncertainties inherent in this case, Plaintiffs have applied the "headstart" approach from *Taco Cabana* to the "yardstick" theory in order to provide a "reasonable basis" for "reasonably forecast profits." That approach reasonably measures Plaintiffs' lost profits in these circumstances by finding a close model or "yardstick" for Plaintiffs' projected success in the absence of infringement and attempts to quantify the damage done by Zobmondo's infringement and head start in the game market.

Relying on a Ninth Circuit case, Zobmondo claims that a series of "speculative assumptions" precludes a jury from awarding profits on Plaintiffs' "yardstick" theory. *See McClaran v. Plastic Indus., Inc.,* 97 F.3d 347, 361–62 (9th Cir.1996). In *McClaran,* the plaintiff owned a trademark for a type of fiberglass kayak he made by hand, but another manufacturer used the plaintiff's mark on kayaks manufactured using "rotomolding." 97 F.3d at 352–53. The plaintiff obtained more than $800,000 in damages against the infringer, but the Ninth Circuit set that award aside because it was not proved with reasonable certainty. *Id.* at 361. The award was intended to compensate the plaintiff for "lost rotomolding profits," that is, "the profits [the plaintiff] would have made if he had entered the rotomolding business" but could not because of the defendant's infringement. *Id.* The court found the award speculative because the plaintiff was not making or selling any kayaks at the time of the infringement; although the plaintiff "had once contemplated entering the rotomolding business," he had not done so when he had the opportunity to. *Id.* The plaintiff's the-

ory of damages was therefore similar to Plaintiffs' here: "he planned to enter the rotomolding business" but he was "deterred from doing so by [the defendant's] infringement," so "the infringement deprived [him] of not only the sales he would have made to date, but also the entire value of the business he never started." *Id.*

The court therefore found the damages award speculative in four ways: (1) "it requires the jury to believe [the plaintiff's] testimony that he wanted to enter the rotomolding business"; (2) "the jury must believe that the only reason [the plaintiff] did not enter the rotomolding business is because" the defendant was using the plaintiff's trademark, that is, the plaintiff would have competed with the infringer, "but he reasonably believed it would have been hopeless to compete" with the infringing products; (3) "the jury must believe that [the plaintiff's] business venture would have made a profit, but that profits would have been diminished or eliminated by the customer confusion caused by" the infringing mark; and (4) "the jury must believe that the profit he would have made, competing against properly marked [kayaks], amounted to" more than $800,000. *Id.* The first three assumptions "relate to the existence of damages, while assumption four relates to the amount of damages," and the court found the fourth assumption particularly problematic because "nobody had ever made a profit from" the kayaks bearing the plaintiff's trademark. *Id.* at 362.

Zobmondo argues that, as in *McClaran,* the jury must make a series of speculative assumptions in order to award Plaintiffs all of Zobmondo's profits under Plaintiffs' "yardstick" theory: (1) starting in 2005, Heimberg and Gomberg could have sold a family-oriented game; (2) Heimberg and Gomberg could have sold that game but

believed efforts to do so would have been useless because Zobmondo was already selling its game with retailers; (3) Plaintiffs would have secured mass market distribution with retailers like Walmart and Target; (4) Plaintiffs could have advertised similarly to Zobmondo; (5) Plaintiffs would have captured Zobmondo's sales; and (6) Plaintiffs would have used similar profit margins to Zobmondo to achieve similar profits.

Unlike in *McClaran*, however, Plaintiffs have offered evidence to support an inference of the existence of damages[12] and have offered Zobmondo's experience as a model of the profits they could have made but for Zobmondo's infringement.[13] While Plaintiffs wanted to enter the board game market like the plaintiff in *McClaran* wanted to enter the rotomolding business, unlike the plaintiff in *McClaran*, Plaintiffs here actually tried to do so. They filed a trademark application for games and books bearing the "Would You Rather ...?" mark and developed an entire line of books bearing the mark, including different versions targeting different audiences. They then developed and sold a game in late 2004, but by that time, Zobmondo had a two-year head start in selling its own games. By contrast, the plaintiff in *McClaran* never tried to enter the rotomolding business when he had the oppor-

tunity to, leaving the jury to speculate that he would have entered the market but for the defendant's infringement.

Moreover, unlike the plaintiff in *McClaran*, Heimberg and Gomberg were actually turned away by retailers because those retailers were already selling Zobmondo's game, which substantiated their belief that there was no business reason to create different versions of their game because they could not get retail placement with Zobmondo's game on the market.[14] Plaintiffs had been selling their books through mid-level retailers like Barnes and Noble, Urban Outfitters, and Spencers' Gifts, but those retailers would not take Plaintiffs' game because they were already selling Zobmondo's game bearing the "Would You Rather ...?" mark. And without that placement, Plaintiffs could not easily secure placement of any version of their game with mass market retailers like Walmart and Target because the natural progression for an independently released game like Plaintiffs' is to start selling at small and specialty retailers, then mid-level retailers, and then enter mass market retailers. (Kristoffy Decl. ¶ 9.) Even when Spin Master was able to approach mass market retailers like Walmart and Target with its family-friendly version of Plaintiffs' game, those retailers declined to reg-

12. At oral argument, Zobmondo conceded that, for the purpose of this motion, Plaintiffs could create a genuine issue over the fact of damage, but argued that Plaintiffs could not create a genuine issue over the amount of damages, which Zobmondo argues is speculative.

13. For that reason, this case is also unlike *Zazu Designs v. L'Oreal, S.A.*, 979 F.2d 499, 505 (7th Cir.1992). In *Zazu*, the court refused to award lost profits of $4 per bottle of 25,000 unsold bottles of shampoo and conditioner because there was no evidence that the plaintiff "could sell a single quart of shampoo, let alone that it would make a profit of

$4 per bottle," that "other salons that have tried to sell hair products nationally made profits approximating" the plaintiff's award, or that any "sales would have been displaced by the products with" the infringing mark. 979 F.2d at 505. Thus, the plaintiff's claim to lost profits was supported only by "rank speculation." *Id.* at 506.

14. Zobmondo argues that this testimony is self-serving and there is no contemporaneous evidence showing that Heimberg and Gomberg intended to offer a family-friendly game. This, of course, is a factual dispute for the jury to decide.

ularly stock it because they were already selling Zobmondo's Classic game bearing the "Would You Rather ...?" mark. The plaintiff in *McClaran*, in contrast, presented no evidence to substantiate his claim that it would have been "hopeless" to enter the rotomolding business in light of the defendant's presence there. Thus, the jury could conclude from Plaintiffs' evidence that Plaintiffs reasonably believed that they could have entered the market with a family-friendly game but choose not to do so because Zobmondo's game was already on the market.

Similarly, with regard to advertising, sales, and profits, obviously if Plaintiffs had sales approaching Zobmondo's, they would have had more money to spend on advertising as Zobmondo did, and they may have had the ability to adjust their profit margins to match Zobmondo's. With Zobmondo's game on the market, however, Plaintiffs had to adjust their profit margins down to compete with Zobmondo. A jury could reasonably infer that Plaintiffs could have approached Zobmondo's sales and success if given the chance to advertise and adjust profit margins like Zobmondo did.

Finally, unlike in *McClaran*, where there was no evidence that the plaintiff would have made a profit by entering the rotomolding business because no one had made a profit on the kayaks bearing the plaintiff's mark, here Zobmondo made a significant profit selling a "Would You Rather ...?" board game. Thus, because Zobmondo's success could provide a model for the profits Plaintiffs could have made, the jury in this case need not speculate that Plaintiffs would have made a profit in the absence of Zobmondo's infringement.

In these circumstances, Dr. Goedde's yardstick theory may be the best measure of damages in this case. As *Bigelow* suggested, Zobmondo's exclusion of Plaintiffs

from the board game market was so complete that Plaintiffs were unable to develop their own brand using a mark they owned. That leaves Zobmondo's success as a very close model of what Plaintiffs could have achieved using the "Would You Rather ...?" mark unencumbered by infringement. Plaintiffs' evidence, coupled with Dr. Goedde's opinion, creates a triable issue of fact over Plaintiffs' lost profits, so the Court will permit Plaintiffs to present their lost profits theory to the jury. Of course, Zobmondo may offer evidence to convince the jury that some or all of its profits are not a reasonable measure of Plaintiffs' lost profits, similar to proving costs or deductions under the Lanham Act. *Tamko Roofing*, 282 F.3d at 37. But because the jury must decide whether Plaintiffs are entitled to damages and in what amount, summary adjudication is unwarranted.

### B. *Disgorgement*

Plaintiffs' theory of disgorgement is straightforward: Zobmondo should be divested of all ill-gotten profits from its use of the "Would You Rather ...?" mark because Horn engaged in "brash, willful, and reckless conduct in 'seizing' the 'Would You Rather ...?' trademark from [Plaintiffs]—and following a 'sue first' strategy—using litigation, misinformation, and other underhanded tactics to prevent Plaintiffs from achieving marketplace distribution of their 'Would You Rather ...?' game." (Opp. 1.)

Zobmondo attempts to undermine this claim in several ways. It argues first that the willfulness required to support disgorgement is limited to an infringer's attempts to trade off the mark holder's established goodwill, and there is no evidence of that in this case. Should that argument fail, Zobmondo argues that Plaintiffs at least cannot disgorge Zob-

mondo's profits before 2005 because it had no enforceable rights before that time. Finally, Zobmondo argues that if none of these arguments carries the day, disgorgement is not available for profits made before 2005 because Horn believed in good faith that Zobmondo had common law priority at that time or after 2008 because Horn relied in good faith on this Court's decision granting summary judgment to Zobmondo, even though that decision was reversed on appeal.

### 1. Willfulness Required to Support Disgorgement

■ In the Ninth Circuit, willfulness is required to disgorge an infringer of its ill-gotten profits. See Adray, 76 F.3d at 988; Lindy Pen, 982 F.2d at 1405–07. In Adray, for example, the plaintiff argued that the district court erred in instructing the jury that it must find willful infringement before awarding the defendant's profits to the plaintiff. 76 F.3d at 988. In approving the jury instruction, the court explained that "[a]n instruction that willful infringement is a prerequisite to an award of defendant's profits may be error in some circumstances (as when plaintiff seeks the defendant's profits as a measure of his own damage . . .), but was appropriate on the record in this case" because the plaintiff did not seek to recover the defendant's profits "as a measure of his own lost sales." Id. Thus, "in these circumstances, [the plaintiff] could recover [the defendant's] profits only if the infringement was willful." Id. The court in Adray cited Lindy Pen, which also held that an accounting of profits was permitted "only in those cases where the infringement is 'willfully calculated to exploit the advantage of an established mark,'" although no ac-

counting on a theory of disgorgement was warranted because the case "simply [did] not involve willful infringement." 982 F.2d at 1405–06.

Plaintiffs urge the Court not to read Adray and Lindy Pen to require willfulness in all cases, but those cases do not leave room for Plaintiffs' interpretation. Nor do Plaintiffs' other cases suggest that willfulness is optional for disgorgement. See, e.g., Polo Fashions, Inc. v. Dick Bruhn, Inc., 793 F.2d 1132, 1133, 1135 (9th Cir.1986) (addressing adequacy of profits award in counterfeiting case in which defendants had committed "willful infringement"); Playboy Enters. v. Baccarat Clothing Co., 692 F.2d 1272, 1275–76 (9th Cir.1982) (also addressing adequacy of profits award in counterfeiting case in which defendants "were guilty of willful trademark infringement"); Faberge, Inc. v. Saxony Prods., Inc., 605 F.2d 426, 429 (9th Cir.1979) (per curiam) (stating that if willfulness is present, the court may, but is not required to, award an infringer's profits to plaintiff).[15] And of course, the out-of-circuit cases cited by Plaintiffs do not compel a contrary conclusion, even if they created a rule making willfulness optional. (Opp. 9 n. 6.)

■ While a showing of willfulness is clearly required by Lindy Pen and Adray to justify disgorgement, the parties dispute what Plaintiffs must show to satisfy that requirement. Zobmondo interprets Lindy Pen to allow disgorgement "only in those cases where the infringement is 'willfully calculated to exploit the advantage of an established mark,'" id. at 1405, and "only where the defendant is 'attempting

---

**15.** Plaintiffs also cite Mishawaka Rubber, but that case did not involve disgorgement; rather, the Supreme Court addressed only the proxy theory of damages when it reviewed an award of the infringer's profits "from sales to purchasers who were induced to buy because they believed the [infringing product] to be those of plaintiff and which sales plaintiff would otherwise have made." 316 U.S. at 204, 62 S.Ct. 1022.

to gain the value of an established name of another,'" *id.* at 1406. *See also Hydramedia Corp. v. Hydra Media Group, Inc.,* 392 Fed.Appx. 522, 523 (9th Cir.2010) (unpublished) (finding no willfulness under *Lindy Pen* because "Defendant was not trading off Plaintiff's name."). Plaintiffs dispute that *Lindy Pen* required proof that the infringer intended to trade off the established name of another to show willfulness; instead, they argue that a broader standard can apply based on "deliberate," "false," "misleading," or "fraudulent" conduct. *See Lindy Pen,* 982 F.2d at 1406 (explaining that courts "generally apply forceful labels such as 'deliberate,' 'false,' 'misleading,' or 'fraudulent' to conduct" that constitutes "willful infringement").[16] Although this is a close question given the lack of clarity in *Lindy Pen,* the Court finds that *Lindy Pen* requires at least a showing of trading on the mark holder's established name as part of the willfulness required to justify disgorgement.

In *Lindy Pen,* the Ninth Circuit reviewed the district court's denial of an accounting of profits because the defendant's "infringement was innocent and accomplished without intent to capitalize on [the plaintiff's] trade name." *Id.* at 1405. After noting that an accounting of profits "is not automatic and must be granted in light of equitable considerations," the court explained that, "[w]here trademark infringement is deliberate and willful, this court has found that a remedy no greater than an injunction 'slights' the public," but that this standard applies "only in those cases where the infringement is 'willfully calculated to exploit the advantage of an

established mark.'" *Id.* Thus, "[w]hen awarding profits, the court is cautioned that the 'Plaintiff is not ... entitled to a windfall.'" *Id.* (ellipsis in original).

The court went on to explain that "[w]illful infringement carries a connotation of deliberate intent to deceive," and cited different Circuits' "forceful labels" used to define willful conduct, such as "deliberate," "false," "misleading," or "fraudulent." *Id.* at 1406. It then concluded that discussion by stating that, "[i]ndeed, this court has cautioned that an accounting is proper only where the defendant is 'attempting to gain the value of an established name of another.'" *Id.* (quoting *Maier,* 390 F.2d at 123).

Applying the law to the facts of the case, the court found that the defendant's infringement was not willful because the plaintiff was "experiencing an overall business decline," the defendant's knowledge of the plaintiff's rights was "attenuated at best," the mark at issue was weak, and there was no evidence of actual confusion. *Id.* The court also found that any deterrence rationale for an accounting—eliminating the "financial rewards" of infringement—was not served because the trademark was weak and the infringement unintentional, and the defendant's "major position in the pen industry makes it clear that it was not trading on [the plaintiff's] relatively obscure name." *Id.* at 1406–07 ("'deterrence is too weak and too easily invoked a justification for the severe and often cumbersome remedy of a profits award ...'" (quoting *ALPO Petfoods, Inc. v. Ralston Purina Co.,* 913 F.2d 958, 969 (D.C.Cir.1990))). Therefore, "[t]o award profits in this situation would

---

**16.** Apart from the cases discussed *infra,* Plaintiffs' cited cases did not address the standard for willfulness to justify disgorgement. *See, e.g., Interstellar Starship Servs., Ltd. v. Epix, Inc.,* 184 F.3d 1107, 1111 (9th Cir.1999) (addressing intent as part of likelihood of confusion analysis); *Chanel, Inc. v. Italian Activew-*

*ear of Fla., Inc.,* 931 F.2d 1472, 1476 (11th Cir.1991) (analyzing intent as justification for treble damages and attorney's fees for counterfeiting); *Mobil Oil Corp. v. Pegasus Petrol. Corp.,* 818 F.2d 254, 259 (2d Cir.1987) (addressing bad faith as part of likelihood of confusion analysis).

amount to a punishment in violation of the Lanham Act which clearly stipulates that a remedy 'shall constitute compensation not a penalty.'" *Id.* at 1407.

There is considerable appeal to Plaintiffs' argument that willfulness should not be limited to trading off the plaintiff's established name, given that the court in *Lindy Pen* identified other considerations that undercut the claim of willfulness there, such as the weakness of the mark and the defendant's unintentional infringement. Reading *Lindy Pen* not to place limits on proof of willfulness also might deter infringement in cases like this one, where there is evidence that Zobmondo disregarded Plaintiffs' rights in order to prevent them from establishing goodwill in their mark, but no evidence that Zobmondo sought to trade on Plaintiffs' established name.

 Even more, *Lindy Pen* was decided almost twenty years ago, so it did not have the benefit of more developed law on trademark damages, including as that law applies to cases like this one, in which the alleged willful infringer is the larger player in the market and sought to overtake the smaller trademark-holder. In fact, some non-binding cases have suggested that this willfulness standard may be different in cases of reverse confusion because an infringer's intent to trade off the established goodwill of the smaller, less established plaintiff is necessarily absent. *See Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 961 (7th Cir.1992) (rejecting argument that profits were unavailable "because there was no evidence that [defendant] intended to trade on [plaintiff's] good will or reputation; indeed, such an intent is necessarily absent in a reverse confusion case."); *Quia*, 2011 WL 2749576, at *8 (suggesting that, "in the context of reverse confusion, the junior user's knowledge of the senior user's mark at the time of infringement may establish wil[l]fulness.").[17]

If the Court were free to read *Lindy Pen* this way, the Court might allow Plaintiffs' disgorgement claim to proceed. But Plaintiffs' broad interpretation cannot be squared with the language of *Lindy Pen*, which required some showing of intent to trade off the mark holder's "established name" as a necessary (but perhaps not sufficient) condition to justify a disgorgement remedy. Not only did the court twice set forth a rule that expressly limited disgorgement "only" to cases involving attempts to "exploit the advantage of an established mark" and "gain the value of an established name of another," but it also applied that rule to find that disgorgement would have amounted to a penalty and not compensation because the defendant with a "major position in the pen industry" was not trading off the plaintiff's "relatively obscure name." That rule would not change when there is other evidence of intentional infringement. Disgorging the infringer's significant profits without proof of trading off the mark holder's goodwill would still amount to a penalty to the infringer and a windfall to the trademark holder, who has only a "relatively obscure name" to appropriate, even if the infringer's conduct was otherwise

---

**17.** The difference between forward and reverse confusion turns on how consumers are potentially deceived: "Forward confusion occurs when customers believe that goods bearing the junior mark came from, or were sponsored by, the senior mark holder," whereas "reverse confusion occurs when consumers dealing with the senior mark holder believe that they are doing business with the junior one." *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 630 (9th Cir.2005). The Ninth Circuit did not formally recognize the theory of reverse confusion until 1998, five years after *Lindy Pen* was decided. *Dreamwerks Prod. Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1130 (9th Cir.1998).

intentional. Thus, to avoid penalizing an infringer in violation of the Lanham Act, the court in *Lindy Pen* required a showing of intent to "exploit the advantage of an established mark" and "gain the value of an established name of another" to justify disgorgement.

██ . Although Plaintiffs offer evidence to show that Zobmondo willfully attempted to "seize" the "Would You Rather ...?" mark, they have presented no evidence to suggest that Zobmondo adopted the mark intending to trade on Plaintiffs' established name. Rather, Plaintiffs' evidence, if assumed true, establishes precisely the opposite—that Zobmondo "knowingly adopted Plaintiffs' mark as [its] own, and took every step possible to prevent Plaintiffs from succeeding" in games, thereby arresting Plaintiffs' efforts to develop goodwill in the mark. (Opp. 15, 18.) Likewise, Plaintiffs' proxy theory of lost profits damages discussed above is inconsistent with an intent to trade on Plaintiffs' established name because that theory rests entirely on the premise that Zobmondo stymied Plaintiffs' ability to develop a "Would You Rather ...?" brand by "seizing" the trademark before Plaintiffs could penetrate the market. Thus, while Plaintiffs' evidence of willfulness may be relevant for other purposes (such as treble damages and attorney's fees—matters the Court does not decide at this time), Plaintiffs have not raised a genuine dispute over willfulness for disgorgement purposes and summary adjudication of this theory is warranted.

## 2. *Common Law Infringement as Basis for Punitive Damages*

As an alternative to the argument that Plaintiffs cannot show willfulness as re-quired for disgorgement, Zobmondo argues that Plaintiffs at least cannot disgorge profits Zobmondo made before Plaintiffs' federal registration issued in 2005 because (1) Plaintiffs cannot get damages for infringing Plaintiffs' federally registered mark before their registration issued in 2005 and (2) Plaintiffs did not have common law priority of use to obtain any damages before 2005 based on their common law claim. Because the Court has concluded that Plaintiffs cannot show willfulness for disgorgement during any time period, this issue is moot. However, Plaintiffs also seek punitive damages, but because punitive damages are not available under the Lanham Act,[18] Plaintiffs' only entitlement to punitive damages arises from their common law infringement claim. Thus, the Court will consider whether Plaintiffs' common law claim is viable.

██ In order to prevail on a common law trademark infringement claim, a trademark holder must show, *inter alia*, priority of use. *Am. Petrofina, Inc. v. Petrofina of Cal., Inc.*, 596 F.2d 896, 897 (9th Cir.1979) ("Under both California common law and statutes, whosoever first adopts and uses a trade name, either within or without the state, is its original owner." (footnote omitted)); *see also Allard Enters. v. Advanced Programming Resources, Inc.*, 249 F.3d 564, 571 (6th Cir. 2001) ("At common law, ownership of trademark or service mark rights is obtained by actual use."). "A person claiming senior rights in a trademark must establish not only that he or she used the mark before the mark was registered, but

---

**18.** *See Duncan v. Stuetzle,* 76 F.3d 1480, 1490 (9th Cir.1996) ("[T]his court has previously noted that punitive damages are not available under the Lanham Act."); *Getty Petroleum Corp. v. Bartco Petroleum Corp.,* 858 F.2d 103,

113 (2d Cir.1988) ("[W]e hold that § 35 of the Lanham Act does not authorize an additional award of punitive damages for willful infringement of a registered trademark.").

also that such use has continued to the present." *Watec Co. v. Liu*, 403 F.3d 645, 654 (9th Cir.2005). Thus, a party claiming common law priority must establish (1) "both adoption of the marks and use in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark"; and (2) the "use of the marks was continuous and not interrupted." *Dept. of Parks & Rec. v. Bazaar Del Mundo Inc.*, 448 F.3d 1118, 1126 (9th Cir.2006) (internal quotation marks omitted).

■■■ While a federal registration is prima facie evidence of ownership, the Lanham Act registration process does not alter the common law use requirement: "[r]egistration under the Lanham Act has no effect on the registrant's rights under the common law, which requires a mark to have been used in commerce before a protectable ownership interest in the mark arises." *Id.* at 1125. Therefore, " '[t]o acquire ownership of a trademark it is not enough to have invented the mark first or even to have registered it first; the party claiming ownership must have been the first to actually use the mark in the sale of goods or services.' " *Id.; see also Allard*, 249 F.3d at 572 ("Federal registration of a trademark or service mark cannot create rights and priority over others who have previously used the mark in commerce[.]"). When a federal registration exists, the challenger may "rebut the presumption of ownership with evidence establishing its own prior use in commerce of the registered mark." *Bazaar Del Mundo*, 448 F.3d at 1124.

### a. *Plaintiffs' Priority Based on ITU Application*

■■■ Plaintiffs first argue that their ITU application filed in 1997 gave them constructive common law priority over Zobmondo's 1998 use, which, if true, would dispose of the parties' dispute as a matter of law. The Court rejects this argument, however, because the law clearly requires actual use to create common law priority and an ITU application, which is based only on an intent to use a mark, cannot be proof of actual use. Thus, while an ITU application may create constructive priority for Lanham Act purposes, that is a statutory construct for a federal claim; in a common law priority dispute, an ITU applicant must still show that it actually used the mark before the alleged infringer to gain common law priority.[19] Thus, the date of Plaintiffs' ITU application did not confer common law priority.

### b. *Zobmondo's Priority Date*

With regard to Zobmondo's priority date, the parties do not dispute that Zobmondo first used the phrase "Would You Rather" in the tagline of its game starting February 1998. They also do not dispute that between 2000 and early 2002 Zobmon-

---

**19.** While there is a line of cases holding that a party may not defeat a federal registration by claiming actual use after an ITU application is filed but before the registration issues, that authority does not establish that an applicant may use the ITU constructive use date to establish priority for a common law claim. *See, e.g., Zirco Corp. v. Am. Tele. & Tele. Co.*, 21 U.S.P.Q.2d 1542, 1544 (1991) (dismissing opposition to ITU application based on a claim of common law priority because the ITU constructive use provision was intended in part "to prevent a third party from acquiring common law rights in a mark after the filing date of the intent-to-use application."); *see also Aktieselskabet AF 21. Nov. 2001 v. Fame Jeans Inc.*, 525 F.3d 8, 19 (D.C.Cir.2008) ("[A]n intent-to-use applicant may rely on his filing date to establish priority during an opposition proceeding."); *Lucent Info. Mgmt., Inc. v. Lucent Techs., Inc.*, 186 F.3d 311, 315 (3d Cir.1999) (analyzing common law use prior to ITU application date to determine which party had priority in mark).

do exclusively licensed to Hasbro the right to distribute its game and Hasbro's version of Zobmondo's game did not use the phrase "Would You Rather" in the title or tagline.

■ The Ninth Circuit has imposed a strict "continuous use" requirement to demonstrate common law priority: "To be a continuous use, the use must be maintained without interruption." *Casual Corner Assocs., Inc. v. Casual Stores of Nev., Inc.*, 493 F.2d 709, 712 (9th Cir.1974); *see also Conversive, Inc. v. Conversagent, Inc.*, 433 F.Supp.2d 1079, 1089 (C.D.Cal.2006) (quoting same); *Garden of Life, Inc. v. Letzer*, 318 F.Supp.2d 946, 957 (C.D.Cal. 2004) (same). Even short periods of nonuse can break the chain of continuous use, such as in *Casual Corner*, where a one-year period of "complete nonuse" defeated a claim of priority, 493 F.2d at 712, and in *Conversive*, where a two-year period of nonuse defeated priority, 433 F.Supp.2d at 1089–90. *Cf. Bazaar Del Mundo*, 448 F.3d at 1127 (finding no continuous use based on one use thirty-five years prior). However, "continuous use" may exist so long as the use is more than " 'sporadic, casual, and nominal' " and efforts are undertaken to establish " 'a trade in the good sold under the mark or at least an active and public attempt to establish such a trade.' " *Conversive*, 433 F.Supp.2d at 1089 (quoting *Garden of Life*, 318 F.Supp.2d at 957).

■ Zobmondo argues that *Casual Corner* is not controlling because it arose in a different infringement scenario where the defendant was attempting to rebut the plaintiff's incontestable federal registration. In *Casual Corner*, the plaintiff had obtained a federal registration and, because it had used the trademark continuously for five years, the registration had become incontestable under 15 U.S.C. § 1065. 493 F.2d at 711. Even an incontestable mark under § 1065 is subject to "a valid right acquired under state law by a use continuing from a date prior to the federal registration and publication." *Id.* The defendant attempted to rebut incontestability by claiming common law priority, which the court rejected in light of the one-year period of nonuse. *Id.* at 712. While the court addressed the meaning of the word "continuing" as used in the incontestability statute, there is nothing to suggest that the same rule does not apply to a common law priority claim. Indeed, the courts in *Conversive* and *Garden of Life* used the *Casual Corner* test to analyze common law priority without discussing incontestability, and a respected secondary source explains that continuous use is required to demonstrate priority in all circumstances. *See* 2 McCarthy on Trademarks and Unfair Competition § 16:9 (4th ed. 2010) ("To establish ownership of a mark, the prior user must establish not only that at some date in the past it used the mark, but that such use has continued to the present."). Thus, there is no indication that the common law "continuous use" is any different than "continuing" use under § 1065.

■ Zobmondo also argues that this application of the "continuous use" requirement is tantamount to "abandonment" under § 1127, which can only defeat trademark rights if the party claiming abandonment "strictly prov[es]" both "(1) discontinuance of trademark use *and* (2) intent not to resume such use." *Electro Source, LLC v. Brandess–Kalt–Aetna Group, Inc.*, 458 F.3d 931, 935 & n. 2 (9th Cir.2006) (emphasis in original). However, the court in *Casual Corner* rejected the argument that one must show abandonment in order to prove a lack of "continuous use" for priority purposes under § 1065, in part because requiring an affirmative showing of abandonment would shift the burden of establishing common

law priority from the claimant to the owner of the federal registration. 493 F.2d at 712. The same is true even when only competing common law rights are at issue: the party claiming common law priority (here, Zobmondo) bears the burden to show continuing use, but requiring a showing of abandonment would shift the burden to the party challenging priority (here, Plaintiffs) to show both a break in use and intent not to resume use. In any case, abandonment in *Electro Source* was asserted as an affirmative defense to a claim of infringement of a federally registered mark, not as a way to establish common law priority, as is the case here. Thus, the inquiry into common law priority is not controlled by the requirements of abandonment.[20]

■■■ Turning to the facts here, Zobmondo has failed to show the continuous use required by *Casual Corner* and *Conversive* to establish common law priority as of 1998 in light of Hasbro's sales of Zobmondo's game between 2000 and 2002 without use of the "Would You Rather ...?" phrase. Entered into in early 2000, the exclusive license between Zobmondo and Hasbro provided that Zobmondo could not license the game to anyone else and could not sell the game "in any manner which may conflict with the exclusive grant of rights" under the licensing agreement, although Zobmondo was permitted to "sell off" through December 31, 2000 "completed units of the Item on hand" as of the effective date of the agreement. (Craven Supp. Decl., Ex. C ¶ 5.)

Zobmondo purportedly exercised its rights under the sell-off provision to sell approximately 8,000 units of its 1998 and 1999 games in 2000, five units in 2001, and 63 units in 2002. (Horn Supp. Decl. ¶ 5, Ex. A.) However, Plaintiffs offered more detailed financial data from Zobmondo, which demonstrates that for a period of nearly two years—from the beginning of 2001 through November 2002—Zobmondo only sold six units, all on the same day. For the 1998 game, Zobmondo sold four units in 2001 and no units in 2002; and for the 1999 game, Zobmondo sold two units in 2001 and no units in 2002 until November of that year, which was after the license was terminated. (Craven Supp. Decl. ¶ 7, Exs. E, F.) There no evidence that Hasbro objected to these sales in 2001, although there is no evidence that Hasbro knew about those sales either.

Zobmondo's sales of six units on one day during a nearly two-year period between 2001 and November 2002 shows only " 'sporadic, casual, and nominal' " use that does not satisfy the continuous use requirement under *Casual Corner*. And even if they were more than merely "sporadic" and "nominal," they could not have established " 'a trade in the good sold under the mark or at least an active and public attempt to establish such a trade' " as a matter of law because only Hasbro had the exclusive right to develop a trade in Zobmondo's games during that time. Thus, like the one-year period in *Casual Corner* and two-year period in *Conversive*, Zobmondo's nearly two-year gap without using the mark cannot demonstrate contin-

**20.** The out-of-Circuit cases Zobmondo cites to support requiring a showing of abandonment for common law priority claims do not compel a different conclusion. *See Crash Dummy Movie, LLC v. Mattel, Inc.*, 601 F.3d 1387, 1391 (Fed.Cir.2010); *Natural Answers, Inc. v. SmithKline Beecham Corp.*, 529 F.3d 1325, 1329 (11th Cir.2008). Unlike *Casual Corner*, in both of those cases, the courts engrafted the abandonment requirements from § 1127 onto claims of common law priority in the absence of valid federal registrations without explaining why that was appropriate.

uous use starting in 1998.[21] The relevant priority date for Zobmondo's use is therefore November 2002.[22]

### c. *Plaintiffs' Priority Date*

Having concluded that Zobmondo's priority date can be no earlier than November 2002, the Court must determine whether Plaintiffs can claim common law priority before that time. Because Plaintiffs did not issue a game until the end of 2004, they must establish priority with the publication of their first "Would You Rather ...?" book in 1997 and their second book in 1999, along with other activities that might demonstrate trademark use before 2002.

 The title of a single book cannot be a trademark because it does not "serve as a source identifier" that creates "an association between the book's title (the alleged mark) and the source of the book (the publisher)." *Herbko Int'l, Inc. v. Kappa Books, Inc.*, 308 F.3d 1156, 1162–63 (Fed.Cir.2002). The name of a book series, however, may serve a trademark function, "at least while [the series] is still being published," because the name "indicat[es] that each book of the series comes from the same source as the others." *In re Cooper*, 45 C.C.P.A. 923, 254 F.2d 611, 615 (1958). However, "if a later party uses or applies for a trademark before the

creation of a series (i.e., before publication of a second volume), the proprietary rights for the series title date back to the first volume of the series *only* if the second volume is published within a reasonable time with the requisite association in the public mind," which "requires more than publication of a single book." *Herbko*, 308 F.3d at 1163 (emphasis in original).

Zobmondo has not disputed that Plaintiffs achieved common law priority by 1999 by publishing its second book. For purposes here, then, the Court assumes that, under *Herbko* and *Cooper*, Plaintiffs' publication of two books before Zobmondo issued its repackaged game in 2002 created sufficient source identification to confer on Plaintiffs common law priority by 2002. Zobmondo argues that, even if Plaintiffs achieved common law priority before 2002, Plaintiffs broke the chain of priority by not using the mark on a *series* of books when their second book stopped being printed as of March 2002 and they did not sell any copies of the second book in 2002 and 2003. (Disgorgement SUF Nos. 5–7.) Because Zobmondo continued to sell its game starting in 2002 throughout the time Plaintiffs' second book was not printed or sold, Zobmondo argues that it reestablished its own priority before Plaintiffs issued a second edition of their second book in October

---

21. Even under the use standard for abandonment from *Electro Source*, Zobmondo did not continuously use the "Would You Rather ...?" mark between 2001 and November 2002. As *Electro Source* explained, " '[e]ven a single instance of use is sufficient against a claim of abandonment of a mark if such use is made in good faith,' " but only where "the circumstances legitimately explained the paucity of the sales." 458 F.3d at 938–39. Legitimate explanations do *not* include a "trademark maintenance program" or sales "not made in the ordinary course of trade." *Id.* at 939 n. 6. While Zobmondo has legitimately explained its sales in 2000 as part of its sell-off rights under the Hasbro license, that sell-off period ended on December 31, 2000, so it

cannot explain the six sales in 2001. In any case, Zobmondo could not have made these sales as part of its ordinary course of trade because it gave Hasbro the exclusive right to sell its game, and if Zobmondo's sales were designed to maintain any trademark rights, under *Electro Source*, that is not sufficient to show continuous use.

22. Because Zobmondo's earliest priority date is November 2002, the Court need not also determine whether Zobmondo's use of the phrase "Would You Rather" as part of the tagline on its 1998 game constituted a "trademark use" to establish priority.

2004 and released their game near the same time. (Korn Decl., Ex. 4.)

Zobmondo relies heavily on *Herbko,* but that case addressed a different issue. In *Herbko,* the defendant wanted trademark rights in the title of a series of two books even though, in the time between publishing the first and second books, the plaintiff had filed an ITU application for the mark the defendant used on the books. 308 F.3d at 1160. In that situation, the defendant was limited to arguing that it had priority from the title of a single book. *Id.* at 1162. The court rejected the notion that the first book created trademark rights without showing that the first book had created the "requisite association in the public mind" between the source and the book. *Id.* at 1163. Even though the defendant sold more than one million units of its first book, it "provided no other evidence of association creating activities (e.g., use of mark as trade name)," so the title of its first book alone could not create the required association in the public's mind and therefore could not establish priority. *Id.*

Here, as *Herbko* required, Plaintiffs used the "Would You Rather ...?" mark on two books before Zobmondo's 2002 priority date, creating the required association in the public's mind between Plaintiffs and their books, a point Defendants have not challenged. Therefore, they have overcome the hurdle in *Herbko* to establishing the "Would You Rather ...?" mark as a source identifier for their series. There is nothing in *Herbko* to suggest that, after Plaintiffs' mark became a source identifier for their series, the mark suddenly lost that source-identifying function when the second book went out of print and was not sold during a period of time. In other words, after establishing the mark as a source-identifier for its books, Plaintiffs could have sold one, two, or ten books bearing the "Would You

Rather ...?" mark, and that mark would have continued to serve the same source-identifying function on all of them. Thus, *Herbko* did not compel Plaintiffs to continually sell more than one book bearing the "Would You Rather ...?" mark to preserve the mark's source-identifying function and demonstrate continuing "trademark use" during the period when only one book was being sold.

Furthermore, even if *Herbko* applied here, Plaintiffs have offered evidence that was missing in that case, that is, "other evidence of association creating activities" while the first book was the only one in print. To show continuous use, a party may rely on "'advertising or promotional material connected with the publicizing and/or offering for sale of goods or services, providing that this use has been of such nature and extent as to create an association of the goods or services and the mark with the user thereof.'" *Chance v. Pac–Tel Teletrac Inc.,* 242 F.3d 1151, 1158 (9th Cir.2001). Here, in addition to the sales of their first book, Plaintiffs were still offering both books for sale on their website in 2002, 2003, and 2004 (Gomberg Decl. ¶ 6, Exs. 4–6), which demonstrates that they continuously used the mark on both books during 2002 and 2003, even if no new copies of the second book were printed or sold during that time.

Thus, Plaintiffs gained priority by November 2002, when Zobmondo began using the mark on its repackaged games and did not lose priority at any point thereafter. Because Plaintiffs have demonstrated common law priority over Zobmondo, their common law infringement claim remains alive and their punitive damages claim may be presented to the jury.

### 3. *Willfulness Before 2005 and After 2008*

As a final alternative to its other arguments, Zobmondo argues that disgorgement is not available for profits made be-

fore 2005 because Horn believed that Zobmondo had common law priority at that time or after 2008 because Horn relied on this Court's decision granting summary judgment to Zobmondo, even though that decision was reversed on appeal. In response to these arguments, Plaintiffs objected that Horn was relying on advice of his counsel to form his beliefs during these periods without also waiving privilege as to the advice he received, so they requested either that the arguments be rejected as a matter of law or the motion be denied under Federal Rule of Civil Procedure 56(d) because Plaintiffs were unable to discover facts to fully explore Horn's beliefs. Plaintiffs also filed a motion *in limine* addressing the same issues. (Docket No. 508.)

Because Plaintiffs cannot show willfulness as a matter of law, the Court need not reach these arguments now. Nevertheless, these issues are not entirely moot because they implicate the evidence Plaintiffs may be able to present to the jury to establish willfulness during these periods for the purpose of punitive damages. Thus, the Court reserves ruling on these issues until a later time.

## CONCLUSION

For the foregoing reasons, the Court DENIES Zobmondo's motion for summary adjudication of Plaintiff's lost profits theory of damages and GRANTS IN PART and DENIES IN PART Zobmondo's motion for summary adjudication of Plaintiff's disgorgement theory of damages. At trial, Plaintiffs will be permitted to present their lost profits theory and pursue punitive damages based upon their claim of common law infringement, but they will not be permitted to present their disgorgement theory.